# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2099-17T1

STATE OF NEW JERSEY,

       Plaintiff-Respondent,

v.

ROGER DAVILA-IZAGUIRRE,
a/k/a ROGER A. DAVILA,
ROGER DAVILAIZAGYRRIE,
ROGER A. IZAGUIRRE, and
ROGER IZAGYRRIE,

       Defendant-Appellant.

_____

Argued telephonically April 28, 2020 –
Decided June 12, 2020

Before Judges Yannotti, Hoffman and Currier

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-03-0145.

Susan Lee Romeo, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Susan Lee Romeo, of counsel and on the brief).

Marc A. Festa, Senior Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Marc A. Festa, of counsel and on the brief).

PER CURIAM

In June 2017, a jury found defendant guilty of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count two), and acquitted him of first-degree aggravated sexual assault, N.J.S.A. 2C:14-29(a)(7) (count one). On September 20, 2017, the trial judge sentenced defendant to a seven-year term of imprisonment with an eighty-five percent period of parole ineligibility, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a).

This appeal followed. Challenging both his conviction and sentence, defendant presents the following arguments:

> POINT I
>
> DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE COURT VIOLATED DEFENDANT'S RIGHT TO COMPULSORY PROCESS AND HIS RIGHT TO PRESENT A COMPLETE DEFENSE WHEN IT MISAPPLIED THE RAPE SHIELD STATUTE, N.J.S.A. 2C:14-7, TO EXCLUDE EVIDENCE THAT WOULD HAVE IMPEACHED J.M.'S TESTIMONY AND ESTABLISHED HER MOTIVE TO LIE.
>
> 1. The Rule 104 hearing.

2

2. The Preclusion Of Evidence From Defendant's Wife That Established J.M.'s Motive To Lie And Impeached Her Testimony Violated Defendant's Right To Confrontation And His Right To Present A Complete Defense.

POINT II

DEFENDANT'S CONVICTION MUST BE REVERSED BECAUSE THE POLICE OBTAINED THE WAIVER OF HIS RIGHT AGAINST SELF-INCRIMINATION WITHOUT INFORMING HIM OF THE CHARGES AGAINST HIM, IN VIOLATION OF THE NEW JERSEY SUPREME COURT'S HOLDING IN STATE V. VINCENTY, 237 N.J. 122 (2019) (Not Raised Below).

POINT III

DEFENDANT'S SENTENCE MUST BE REVERSED BECAUSE THE COURT FOUND AGGRAVATING FACTORS THAT WERE NOT SUPPORTED BY THE RECORD, INCLUDING ONE THAT WAS REJECTED BY THE JURY.

Having considered these arguments in light of the record and applicable law, we affirm defendant's conviction and sentence.

I

To celebrate his wife's birthday, defendant organized an outing for family and friends to go to Yankee Stadium for a concert on July 12, 2014. Married

for thirteen years, defendant and his wife had three children together. A party bus provided round-trip transportation for the concertgoers.

Before returning to pick up the concertgoers, the bus picked up five additional guests in Clifton, including J.M. (Julie),[1] a childhood friend of defendant's wife. According to Julie, "My mother grew up with her family in the Dominican Republic and our families are very close." She referred to defendant's wife as her "best friend." Julie's husband, a police officer, did not attend the celebration because he was assigned to work that evening. Julie and her husband have three children.

After the concert, the party bus drove the group around New York City for several hours. The group brought various alcoholic beverages onto the bus and everyone spent the evening drinking and dancing. Julie testified she began drinking Grey Goose vodka and orange juice, and later drank Hennessy cognac. At one point, Julie danced on the lap of defendant's wife and another partygoer, referred to as "Gitch." Julie recounted that two other partygoers, "Albert" and "A.Z.," attempted to grope her, but she "swatted them" away, telling them to stop. Before returning to defendant's New Jersey home, the party bus stopped

---

[1] Because of the sexual nature of the crimes, we use initials and a pseudonym to protect the privacy of the victim. R. 1:38-3(c)(12).

A-2099-17T1

at McDonald's for food; however, Julie remained on the bus, because she felt "dizzy."

At approximately 4:00 a.m., the bus returned to defendant's home, where the party continued; no additional alcoholic beverages were provided at the house. Julie testified she "was already . . . spinning" by the time they reached the house. She texted her husband, informing him that she made it "home." She testified to having difficulty texting her husband, as her vision remained impaired from the alcohol she consumed.

Inside the home, Julie "took a hit of marijuana" and "started to get even like dizzier," until she fell on the floor. After gathering herself, Julie went to the bathroom to "throw water in [her] face" and "sober up," by making herself vomit. She then went out into the T.V. room and sat down on the couch.

Aside from Julie, the last partygoer left around 6:00 a.m. Defendant and his wife found Julie sitting on the couch and decided she would sleep there. Defendant's wife testified she asked Julie if she felt alright, and Julie responded she was "fine." Defendant and his wife then gave Julie a blanket, closed the door, and left the room.

According to Julie, she fell asleep on the couch fully clothed, wearing a top, pants and flip-flops. While asleep, she felt herself "turn over . . . in slow

motion," but the room remained quiet. She next felt her legs "go up" and her "clothes . . . sliding off[.]" Julie did not react or resist, explaining, "The room was quiet. I had gone to sleep. So, I thought I was dreaming that . . . I'm feeling things . . . that my body, that I'm moving. There was nothing like – it was quiet, the room was quiet, so I didn't know that something was happening to me."

After initially testifying she was unaware of another person's presence, Julie recalled feeling pain in her rectum, "coming and going," and hearing defendant's voice whispering, "[Y]eah, yeah, yeah, just like that. Just like you wanted it." She then described feeling "like [she] had wet [herself]."

Once she woke up, Julie went to the bathroom; after touching herself, she noticed blood on her hand and that she only had on her top. This caused Julie to panic and she tried calling several partygoers around 7:00 a.m.; however, calls went unanswered. Julie next called her aunt and told her she believed defendant had raped her. She then called L.L., who also attended the party the night before, exclaiming that defendant raped her. L.L. drove to defendant's house and took Julie to a local hospital.

Julie later told investigating officers she did not call her husband initially, because "she was afraid to and didn't know what he would think"; in addition, "she was blaming herself for what had happened." At the hospital, Julie called

A-2099-17T1

her husband, crying and stating, "I think it was [defendant]." Julie's husband came to the hospital.

At the hospital, Julie underwent an examination by Nurse Annette Casabona, a member of Passaic County's Sexual Assault Response Team; at trial, she testified as an expert in forensic medical examinations. According to Nurse Casabona, her examination of Julie revealed four small abrasions around the anus. She testified the abrasions were likely "caused by friction" or "pressure and movement over that area," such that "just the superficial part of the skin [was] worn away." Nurse Casabona also observed a bruise on the interior part of Julie's left lower leg and further bruising on her right and left arms. She did not note any bleeding.

Nurse Casabona also collected specimen swabs and performed blood and urine tests. At trial, the parties stipulated that blood and semen samples were found on Julie's underwear and vaginal, cervical, anal and rectal swabs were taken. They further stipulated defendant was the source of the DNA found on Julie's underwear but excluded defendant as a possible contributor to the DNA collected from the swab of the cervix. The remaining swabs returned "too much female DNA and not enough male DNA to determine who the male DNA belonged to."

A-2099-17T1

After Nurse Casabona completed her examination, Julie's husband accompanied her to the Passaic Police Department (PPD). That same day, July 13, 2014, officers arrested defendant at his home and took him to the PPD. There, defendant agreed to submit to questioning and provided two video-recorded statements. According to Detective John Rodriguez, before he began the first interview, defendant appeared coherent and understood everything.

Once the first recording began, but before defendant gave his first statement, Detective Rodriguez provided a Miranda[2] warning advisory form. Detective Rodriguez reviewed defendant's Miranda rights and defendant initialed each line of the form in acknowledgement. At that time, defendant declined to have his attorney present.

The interview began with Detective Rodriguez stating, "I'm going to ask you some personal questions. Sunday is today. File control number 2014-32289. Sexual assault is the case." Throughout his initial statement, defendant refused to answer whether he and Julie had sex, repeatedly saying, "I'm not going to answer it because that's just crazy." Nevertheless, he recounted what happened at the birthday party the night before and described Julie as promiscuous and open about her sex life. After Detective Rodriguez questioned

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

defendant about having sex with Julie for a third time, defendant ended the first recorded statement at 12:20 p.m. by declaring, "I don't want to say anything else."

At 1:30 p.m., defendant informed Detective Rodriguez that he wanted to speak with him again. Detective Rodriguez began the second recorded statement by showing defendant his previously signed Miranda waiver form; however, he did not re-read defendant his rights. Defendant then recounted that after he and his wife left Julie on the couch, they went upstairs to their bedroom and had sex. Afterwards, defendant went downstairs nude to get water. Defendant explained Julie woke up and confronted him, naked from the waist down. He alleged she called him "Gitch" and told him "come here, come here." Defendant tried identifying himself and brought Julie back to the couch. There, "she got on top of [him]" and "started riding [him]" until defendant quickly removed her because he was "shocked." According to defendant, Julie said "this is how I'm going to do it to you, Gitch. This is what I want to do with you, Gitch." Detective Rodriguez ended the second recorded statement when defendant's attorney called.

A-2099-17T1

Defendant testified he initially refused to answer Detective Rodriguez's questions because he "knew [he] had committed adultery" and "was ashamed." He further stated he was concerned his answers would affect his marriage.

Before trial, the court held a Rule 104 hearing to address the admissibility of defendant's recorded statements. Defendant claimed he was under the influence of alcohol when he gave the statements; in addition, he argued Detective Rodriguez reviewed the Miranda waiver form too quickly before taking the second statement, without defendant clearly declining to have an attorney present.

After reviewing video recordings of both statements, the trial judge rejected defendant's arguments and found both admissible. He concluded that, despite defendant's admission to consuming alcohol just five to six hours before the statement, defendant did not appear to be intoxicated. The judge noted defendant provided coherent answers and Detective Rodriguez did not detect an odor of alcohol on his breath. Regarding defendant's waiver of his Miranda rights, the judge found Detective Rodriguez's initial thorough review of the waiver form continued to provide defendant with adequate warnings for "a reasonable amount of time[,] in the totality of the circumstances." Lastly, the

judge observed defendant did not say anything to negate his acquiescence to proceed without an attorney present.

On June 17, 2017, defendant's five-day trial commenced. Before the direct examination of defendant's wife, defense counsel alerted the court of his intention to question her regarding past conversations in which Julie allegedly admitted to previous extra-marital affairs. As a result, the court heard the following colloquy detailing the proffered testimony:

> Q:     Ok. During your years of friendship with [Julie] did you ever talk with her about the topic of sexual relations?
>
> A:     All the time.
>
> Q:     More specifically, did the subject of anal sex ever come up?
>
> A:     Yes.
>
> Q:     How did it come up?
>
> A:     She had mentioned before that she had played out her husband a couple of times, and that –
>
> THE COURT:     She had what?
>
> A:     She had played out her husband, like had other affairs with different men, and that her husband had forgiven her for those past events, but that the next time that she would ever do such things she would make sure it would be anal sex because her husband would never find out that way.

11

. . . .

Q:  And one last question. Was she concerned about his knowing about any affairs she may have had?

A:  Yes.

Q:  How do you know?

A:  Because she tells me – she told me everything. We were best friends since we were, like one or two years old.

Q:  Did she tell you what he would do if she had another affair?

A:  He would leave her and take her kids away.

The State objected to the proffered testimony, arguing it clearly fell within the purview of New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, because it involved the prior sexual conduct of the victim.

The trial judge concluded the testimony concerning Julie's past statements allegedly admitting to prior extramarital affairs was subject to the Rape Shield law. With respect to the claim of defendant's wife that Julie told her that if she had an affair it would be via anal sex, the judge ruled it admissible, explaining, "I'm finding that it does go to motive, or it could go to motive. I'm not saying that I believe that that's exactly what happened. That's for the jury to decide."

12                                                        A-2099-17T1

As a result, defendant's wife testified before the jury, "[Julie] said that if she was ever to play her husband out it would be through anal, because he would never be able to find out that way."

On direct examination, defendant's wife testified that after Julie laid down on the couch, she and her husband went upstairs, where they had sex. She recounted that defendant then went downstairs to get water and returned in less than four minutes; however, on cross-examination, she acknowledged she told the police that she and defendant went upstairs and went to sleep. In addition, she told the police that defendant was with her in the bedroom the whole time and that he fell asleep before she did. She also told the police she is a light sleeper and she did not feel the bed move. She further acknowledged that she told the police that Julie was very intoxicated and not okay to drive home.

Defendant then testified, recounting that after returning on the bus from New York, everyone came to his house to continue the celebration. By about 6 a.m., everyone who attended the celebration had left except for Julie, who decided to stay because she was too intoxicated to drive. Defendant testified that he and his wife left Julie in the family room and went to their bedroom on the second floor, where they had sex. After having sex with his wife, defendant said he went downstairs naked to get two bottles of water. Defendant claimed

13

that Julie approached him, nude from the waist down, told him she wanted to have anal sex, brought him to the couch, got on top of him, and began riding him. Defendant stated that, after about four minutes, "I felt disgusted for what I was doing, I told her to get off, and I took her off of me . . . and put her on the couch." Defendant testified that he then went upstairs, gave his wife the water, and laid down in bed.

After both parties rested, the trial court charged the jury on first-degree aggravated sexual assault, N.J.S.A. 2C:14-2A(7), based on defendant having committed "an act of sexual penetration with another person whom the actor knew or should have known was physically helpless, which rendered the victim temporarily incapable of understanding the nature of her conduct, including but not limited to, being incapable of providing consent." The court also charged the jury on second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), based on defendant having committed an "act of sexual penetration" employing "physical force or coercion [but] the victim does not sustain severe personal injury." Following four days of deliberation, the jury acquitted defendant of first-degree aggravated sexual assault but found him guilty of second-degree sexual assault.

Defendant filed a motion for a judgment of acquittal, or in the alternative, for a new trial. Defendant argued the trial judge should set aside his verdict

14

because Julie's testimony corroborated his belief that what happened between them was consensual; in addition, he contended the jurors entered an improper compromised verdict, after the trial judge ordered them to continue deliberating following their report of a deadlock. The judge found no basis to enter a judgment of acquittal, noting, "I don't recall anything in the evidence that was untoward with respect to the eventual verdict in this case."

On his request for a new trial, defendant argued his two recorded statements should have been suppressed because he was intoxicated, and the detective failed to give him a breathalyzer test. Moreover, he asserted the Rape Shield Statute should not have barred his wife from testifying regarding Julie's numerous affairs because the testimony "is so probative to the defense, specifically on the issue of consent."

In sentencing defendant, the trial judge found four aggravating factors and one mitigating factor. The judge found aggravating factor two, N.J.S.A 2C:44-1(a)(2) (the gravity and seriousness of the harm inflicted on the victim) because at the time of the offense, Julie

> appeared to be intoxicated based on the testimony I heard, and therefore I would find that she was substantially incapable of exercising normal or mental power of resistance . . . I also have to couple that with . . . defendant indicat[ing] that she may have

> thought he was somebody else. It seems to me he may
> have been trying to take advantage of the situation.

He found aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant would commit another offense) – despite noting defendant's Avenel report did not indicate a risk of re-offense – because "he does have a good number of municipal court offenses . . . but he also has . . . the indictable theft[.]"

In finding aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (the extent and seriousness of his record), the judge relied on his findings regarding factor three. Lastly, he found aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterrence) because "this is a classic example of what someone should consider when they drink to excess." The judge only found one mitigating factor, factor eleven, N.J.S.A. 2C:44-1(b)(11) (the imprisonment of defendant would be an excessive hardship to his dependents).

Finding the aggravating factors outweighed the sole mitigating factor, the trial judge sentenced defendant to a term of seven years, with an eighty-five percent period of parole ineligibility. The judge also imposed fees, penalties, and Megan's Law reporting requirements. He denied defendant's motion to stay his sentence pending appeal.

This appeal followed.

II

A.

Defendant contends he was denied his right to confrontation and a fair trial when the court excluded the testimony of his wife concerning Julie's alleged multiple affairs. He argues the purported testimony would have established Julie's "strong motive to lie, based on a well-grounded fear of losing her children, and that would have impeached the claims of Julie and her husband that she had no reason to fear his discovery of her conduct."

We review a trial court's evidentiary rulings for an abuse of discretion. State v. McGuire, 419 N.J. Super. 88, 135 (App. Div. 2011). A trial court's evidentiary rulings should not be disturbed on appeal absent a showing of a clear abuse of discretion, in other words, a clear error in judgment. State v. J.A.C., 210 N.J. 281, 295 (2012). In applying this standard, an appellate court should not substitute its own judgment for that of the trial court, unless "the trial court's ruling is so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

The trial court found the challenged evidence qualified as past sexual conduct of Julie, and that it was therefore barred by the Rape Shield law. After

balancing the excluded testimony against defendant's right to confrontation, we agree.

New Jersey's Rape Shield Law presumptively prohibits evidence of the victim's previous "sexual conduct" in prosecutions for certain sexual offenses, including aggravated sexual assault, sexual assault, and endangering the welfare of children. N.J.S.A. 2C:14-7(a). The Rape Shield law defines "sexual conduct" as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living arrangement and life style." N.J.S.A. 2C:14-7(f). The statute protects sexual assault victims from excessive cross-examination, guards against improper use of evidence of a victim's previous sexual experience, and preserves the integrity of trials. State v. Budis, 125 N.J. 519, 529 (1991). "By ensuring that juries will not base their verdicts on prejudice against the victim, the statutes enhance the reliability of the criminal justice system." Ibid.

The Rape Shield law contains an exception to the statutory exclusion if "evidence offered by the defendant regarding the sexual conduct of the victim is relevant and highly material," meets certain other statutory criteria, and has "probative value" that "substantially outweighs . . . the probability that its

admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim." N.J.S.A. 2C:14-7(a). Under subsections (c) and (d) of the statute, evidence of past sexual conduct is only relevant if "it is material to proving the source of semen, pregnancy or disease[,]" N.J.S.A. 2C:14-7(c), or "if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively" consented. N.J.S.A. 2C:14-7(d).

However, the Rape Shield law's narrow exceptions may not unfairly restrict defendants' right to confront the witnesses against them, guaranteed by the United States and New Jersey Constitutions. U.S. Const. amend. VI; N.J. Const. art. 1, ¶ 10. Therefore, "if evidence is relevant and necessary to a fair determination of the issues, the admission of the evidence is constitutionally compelled." State v. Garron, 177 N.J. 147, 171 (2003). Nevertheless, when such evidence is relevant, the trial court must decide whether the probative value outweighs the prejudicial effect to the victim. Budis, 125 N.J. at 532. "The probative value of the prior acts depends on clear proof that they occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense." Id. at 533.

A-2099-17T1

In Budis and Garron, our Supreme Court departed from a literal reading of the Rape Shield law, as stated in J.A.C. The Court noted "the tension between [a] defendant's right to confrontation and the compulsory process of witnesses, and the victim's right to be free from an unnecessary invasion of . . . privacy" under the Rape Shield statue. Garron, 177 N.J. at 153; accord Budis, 125 N.J. at 531. In response, the Court held that "N.J.S.A. 2C:14-7 should be construed to permit evidence of a victim's sexual conduct if 'the evidence [is] relevant to the defense . . . [and] its probative value outweighs its prejudicial effect.'" J.A.C., 210 N.J. at 298 (quoting Budis, 125 N.J. at 532). In so holding, the Court departed from the statute's requirement that evidence be "relevant and highly material," and to have probative value that "substantially outweighs" its "collateral nature or prejudicial effect." State v. Perry, 225 N.J. 222, 236 (2016).

"The 'probative value' of evidence is 'its tendency to establish the proposition that it is offered to prove.'" J.A.C., 210 N.J. at 299-300 (quoting Garron, 177 N.J. at 167 n.2). The probative value of sexual conduct under the Rape Shield law remains dependent "on clear proof that [it] occurred, that the acts are relevant to a material issue in the case, and that they are necessary to the defense." Ibid. (quoting Budis, 125 N.J. at 533). "In short . . . trial courts are required to carefully weigh the relevance, necessity and impact of evidence

20

relating to a victim's sexual history, and to impose case-specific parameters, where appropriate, to any such evidence admitted." Id. at 300-301.

Here, defendant argues that the excluded testimony was probative of whether Julie had a motive to lie about her encounter with him. While the excluded testimony as alleged is relevant to defendant's theory of the case, he failed to establish that its probative value outweighed the prejudicial effect. Defendant's wife did not provide a timeframe for Julie's alleged statements nor did defendant offer any additional corroborating witnesses.

Moreover, as argued by the State, defendant failed to show Julie's concerns were relevant at the time of the alleged assault, or that Julie had a well-grounded fear that her husband would leave her and take the children if she cheated on him again. To the contrary, Julie phoned her husband shortly after realizing the alleged assault occurred; in addition, both she and her husband testified at trial and were subject to cross-examination. The trial judge also permitted defendant's wife to testify as to what Julie allegedly told her regarding anal sex. Therefore, we discern no abuse of discretion in the trial judge's ruling that barred defendant's wife from disclosing Julie's alleged statements admitting to prior extramarital affairs.

A-2099-17T1

B.

Defendant next contends the trial court was required to suppress his two recorded statements because the police failed to inform him that he was being charge with first- and second-degree crimes, contrary to the mandate of State v. Vincenty, 237 N.J. 122 (2019). We disagree.

"The issuance of a criminal complaint and arrest warrant by a judge is an objectively verifiable and distinctive step, a bright line, when the forces of the state stand arrayed against the individual." State v. Nyhammer, 197 N.J. 383, 404 (2009). In Vincenty, our Supreme Court reaffirmed State v. A.G.D., 178 N.J. 56, 68 (2003), in which it stated, "The government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights." 237 N.J. at 125 (alteration in original) (quoting A.G.D., 178 N.J. at 68).

In Vincenty, detectives sought to question the defendant regarding an attempted armed robbery and attempted murder. Id. at 126. The detectives told the defendant he had been identified from a video recording, photograph and DNA evidence as one of the two assailants; however, the detectives failed to inform the defendant that formal charges had already been filed against him. Id.

at 127. The detectives nevertheless proceeded to review the defendant's rights and provided him with a <u>Miranda</u> waiver form before recording the incriminating statements. <u>Ibid.</u>

The Court held the defendant's initial statements to the detectives should be suppressed, noting "[i]f suspects are not informed that a criminal complaint or arrest warrant has been filed against them, they necessarily lack 'critically important information' and thus 'the State cannot sustain its burden' of proving a suspect has knowingly and intelligently waived the right against self-incrimination." <u>Id.</u> at 133-134 (quoting <u>A.G.D.</u>, 178 N.J. at 68).

Defendant's case is distinguishable from <u>Vincenty</u> as no formal charges were filed against him, eliminating the Court's concerns voiced in that case. The record reveals that no arrest warrant or criminal complaint was filed against defendant at the time he waived his <u>Miranda</u> rights and provided the initial statement. In addition, the detective informed defendant of Julie's allegations of sexual assault. Therefore, the detective did not mislead defendant and the trial court did not err in allowing both recorded statements into evidence.

## C.

Defendant further contends the trial court imposed an excessive sentence. He argues the trial judge based his sentencing decision on findings that were

contrary to the record, "because the jury rejected them when it acquitted defendant of aggravated sexual assault." He also argues the judge gave too much weight to aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (the extent and seriousness of his record). Defendant's arguments lack substantive merit; however, we add the following comments.

"An appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). In reviewing a sentence, we must determine whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record;' [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

We are "bound to affirm a sentence, even if [we] would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400-01 (1989); Roth, 95 N.J. at 364-65).

Defendant contends the judge improperly considered the seriousness of his crime at sentencing because the jury acquitted him of first-degree aggravated sexual assault. During sentencing, the trial judge weighed the seriousness of the harm inflicted on Julie by defendant, explaining:

> because at the time of this offense both – or at least [Julie] appeared to be intoxicated based on the testimony I heard, and therefore I would find that she was substantially incapable of exercising normal or mental power of resistance, but I also have to couple that with the testimony that I heard, in that the defendant indicated that she may have thought he was somebody else. It seems to me he may have been trying to take advantage of the situation.

Defendant argues the judge's conclusion, that Julie was intoxicated and defendant took advantage of her, is not supported by the record because the jury acquitted defendant of committing "an act of sexual penetration with another person whom the actor knew or should have known was physically helpless, which rendered the victim temporarily incapable of understanding the nature of her conduct[.]" However, the judge's statement at sentencing was supported by the record and not necessarily inconsistent with the jury's verdict. Furthermore, it remained relevant to the sexual assault for which the jury ultimately convicted defendant.

The judge also did not abuse his discretion by finding aggravating factor six applied. Defendant's record included multiple municipal convictions and one indictable conviction for theft. The judge did not give any additional weight to this factor. Under all of the circumstances, the aggravating factors substantially outweighed the mitigating factors and the trial judge sentenced defendant accordingly.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2099-17T1