**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3417-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSHUA CROSS, a/k/a
JOSHUA M. CROSS,
JOSHUA M. JOHNSON,

     Defendant-Appellant.

_____

Argued January 5, 2022 – Decided January 19, 2022

Before Judges Sabatino, Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 18-10-1790.

Robert Carter Pierce argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robert Carter Pierce, Designated Counsel, on the briefs).

John J. Santoliquido, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Cary Shill, Acting Atlantic County Prosecutor, attorney; John J. Santoliquido, of counsel and on the briefs).

PER CURIAM

After a seven-day jury trial, defendant Joshua Cross was found guilty of murder, N.J.S.A. 2C:11-3(a); conspiracy to commit murder, N.J.S.A. 2C:5-2(a) and N.J.S.A. 2C:11-3(a); aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4); and endangering the welfare of a child, N.J.S.A. 2C:24-4(a).[1] The trial judge sentenced defendant to an aggregate term of forty years, subject to parole ineligibility periods mandated by the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2. The sentence consisted of a custodial term of thirty years on the merged murder, conspiracy, and aggravated assault counts, plus a consecutive ten years for the child endangerment count.

Defendant appeals his conviction and sentence on three grounds: (1) the court erred in not suppressing his confessions, transcripts of which were provided to the jury and one of which was played for the jury at trial; (2) the court should have rejected a consent order withdrawing defendant's earlier guilty plea because defendant contends he was under duress at the time; and (3) his sentence is excessive and disproportionate to the sentences imposed on the

---

[1] Defendant also pled guilty to two controlled dangerous substance offenses, Indictment No. 12-06-1516, based on his possession of such when arrested. These convictions were not part of the trial, nor does he appeal them now.

other three conspirators.  For the reasons that follow, we affirm on the first and third issues, but lack jurisdiction to reach the second issue.

I.

The State's proofs showed that in the summer of 2012, defendant conspired with fellow gang members Mujahid Blackwell (a then-juvenile known as "Mu"), Demarice Bennett ("Big Man") and Khalil Blackwell ("Craze") to kill the victim, Sedrick Lindo.  The killing was apparently precipitated by Lindo making it known to others in the community that defendant and his conspirators were in need of guns and therefore vulnerable.  The conspirators allegedly knew Lindo had a gun and they hoped to rob him of it.

On the day of the homicide, July 29, 2012, the conspirators had breakfast together at a friend's apartment in Atlantic City and planned the killing.  They then dispersed, with defendant and Mu walking together, and the others going in a different direction.  Craze and Big Man acted as lookouts, as did defendant in Mu's company.

Craze called defendant and reported that Lindo was sitting on the porch of his friend's nearby apartment.  Defendant relayed that information to Mu. Defendant and Mu then walked towards the apartment.  After defendant turned into a nearby courtyard, Mu approached Lindo from behind and shot him

3

multiple times, killing him. One of the bullet fragments wounded but did not kill the three-year-old son of Lindo's friend. Portions of these events were recorded on outside surveillance cameras.

After the shooting, defendant gathered with the other conspirators at a friend's apartment. He was arrested about a month later when he was at the Atlantic County Courthouse on another matter. The police also arrested the other conspirators.

After giving him Miranda[2] warnings, detectives obtained incriminating statements from defendant in which he admitted his involvement in the conspiracy and shooting. He was then charged with murder, conspiracy, and other offenses. He moved to suppress his confessions, which the motion judge denied after an evidentiary hearing.

Plea negotiations ensued. Defendant agreed to plead guilty to conspiracy to commit murder and possession of a controlled dangerous substance in exchange for the State recommending a NERA sentence of twelve years. A condition of the agreement was that defendant was to cooperate and testify for the State against the other participants.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

 A-3417-18

A year and a half after he entered his guilty plea, defendant changed his mind, saying he was fearful of retaliation if he cooperated. He moved to withdraw his plea, an application which the State initially opposed, and the trial court denied.

As of a year later, defendant continued to refuse to testify. At that point, defendant, his counsel, and the prosecutor entered into a consent order withdrawing the plea, which the court noted on the record in defendant's presence with the defense attorney's acknowledgement.[3]

As it turned out, defendant was the only conspirator who went to trial, as the three others pled guilty to certain charges. Mu, the juvenile who was the shooter, received a 22-year NERA sentence; Khalil Blackwell received a 16-year NERA sentence; and Bennett received a 10-year NERA sentence.

On appeal, defendant presented the following arguments in his brief:

> POINT I
>
> THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO SUPPRESS HIS [FIRST] CUSTODIAL STATEMENT BECAUSE DEFENDANT DID NOT KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY WAIVE HIS MIRANDA RIGHTS.

---

[3] We have been supplied with an unsigned copy of the consent order, which was referred to at the proceeding at which the court approved the consent order, allowing the guilty plea to be withdrawn.

POINT II

ALL EVIDENCE OBTAINED FROM THE UNCONSTITUTIONAL QUESTIONING OF DEFENDANT MUST BE EXCLUDED AS FRUIT OF THE POISONOUS TREE.

POINT III

THE TRIAL COURT ERRED BY ENTERING A CONSENT ORDER THAT VACATED DEFENDANT'S PLEA AGREEMENT.

POINT IV

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.

In a supplemental brief,[4] defendant presented the following arguments:

POINT I

THE SUFFICIENCY OF A PURPORTED GUILTY PLEA WITHDRAWAL—JUST LIKE THE SUFFICIENCY OF THE INITIAL GUILTY PLEA— IS REVIEWABLE ON DIRECT APPEAL AND DOES NOT REQUIRE CONSIDERATION BY THE LOWER COURT.

POINT II

THE PROPRIETY OF A 'CONSENT ORDER' GUILTY PLEA WITHDRAWAL—WITHOUT

---

[4] We invited and received supplemental briefs from counsel to address whether this appellate court has, and should exercise, jurisdiction with respect to the issue relating to the consent order.

6                                                                                          A-3417-18

SLATER SAFEGUARDS—IS A MATTER OF PUBLIC IMPORTANCE; THIS COURT SHOULD EITHER ADDRESS THE ISSUE OF SUCH CONSENT ORDERS, OR ORDER A LIMITED REMAND TO THE LOWER COURT.

Having considered these points, we affirm defendant's conviction and sentence, and decline jurisdiction over the plea withdrawal and associated consent order.

II.

We first address defendant's contention that the trial court, after a pretrial hearing, erroneously denied his motion to suppress various incriminating statements he made to investigating officers.

In considering those contentions, our standard of review is well established. We review the trial court's factual findings from the suppression hearing on defendant's self-incrimination claims under "a deferential standard." State v. Stas, 212 N.J. 37, 48 (2012). Our appellate function, as it relates to the facts, is simply to consider "whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." State v. Johnson, 42 N.J. 146, 162 (1964); see also State v. Locurto, 157 N.J. 463, 471 (1999). We owe "deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, 42

N.J. at 161; see also Stas, 212 N.J. at 49. By comparison, "with respect to legal determinations or conclusions reached on the basis of the facts[,]" our review is plenary. Stas, 212 N.J. at 49 (citing State v. Handy, 206 N.J. 39, 45 (2011)).

General Background

The circumstances regarding defendant's interrogations were explored at a two-day suppression hearing in May 2018. The hearing was presided over by the same judge who later presided over the trial. The sole witness who testified at the hearing was Lieutenant Kevin Ruga of the Atlantic County Prosecutor's Major Crime Unit, who had been in charge of investigating Lindo's murder. Lieutenant Ruga was the primary interviewer of defendant on the first day he was questioned.

As we will discuss in more detail, on August 27, 2012, about a month after Lindo's death, defendant was arrested and taken to the Atlantic County Prosecutor's Office. He was initially told he was being arrested for outstanding traffic warrants. After being given Miranda warnings and waiving his rights, defendant was then questioned for eight hours on August 27 about Lindo's murder. During that first day of questioning, defendant gave many conflicting but also incriminating statements. The next day, August 28, the prosecutor approved homicide charges against defendant, and he was interviewed again for

four hours, which resulted in his confession to participating in Lindo's murder. The interviews of both days were recorded, and transcripts of the recordings were reviewed by the motion judge.

In his motion to suppress the statements he made during these two days of interviews, defendant made several arguments. He argued that his statements during the first interview should be suppressed because: (1) in reference to the traffic warrants, Detective Neil Kane told defendant, "I think we can do something with that," which defendant contends was coercive; (2) Lieutenant Ruga told defendant, "We can do this all night," implying to defendant he did not have a right to invoke his Fifth Amendment rights later in the interview if he changed his mind about speaking with the officers; and (3) the officers did not offer him medical assistance and stop the interview when his mouth began to bleed.

Defendant further argued that because his statements during the first interview were unconstitutionally obtained, his confession during the second interview was tainted and should also be suppressed.

The First Interview

The interview began at around noon on August 27 and ended at 8:30 p.m. Although defendant was not in handcuffs during the interview, he was told he

9

was "not going to be free to leave" as he was in custody due to the "amount of [outstanding] warrants" he had.

At the suppression hearing, the State played a portion of the video recording of the first interview for the motion judge. The first question heard on the video was a detective's question, "Obviously – obviously, you know who (indiscernible)?" to which defendant responded, "I could care less."[5] The detectives proceeded to ask defendant his name, birthday, home address, phone number, Social Security number, employment status, and his girlfriend's name.

Then, one of the detectives said, "Josh, before we talk to you any further, you got a couple of traffic warrants, are you aware of that?" Defendant responded the warrants might have been issued because he had missed court dates related to seat belt infractions. He told the officers that he missed the court dates because he had been shot. At the time, defendant had two outstanding traffic warrants: one involving a $300 bail amount and one for $80 bail. Detective Kane vaguely said to him, "I think we can do something with that."

_____

[5] Although the transcript reflects it is "indiscernible" what the end of this first question was, it is plausible the officers were asking him, "Obviously – obviously, you know who [killed Lindo]?" This exchange occurred before the Miranda warnings were given.

The detectives then asked him some questions about the shooting. One of the detectives said again, "That's what we want to talk to you about. Like I said, you know, you're in custody right now on those traffic warrants so before we go any further I got to let you know your rights."

At that point, the detectives read him his <u>Miranda</u> rights and confirmed he spoke English and was educated.[6] They showed him a card on which the <u>Miranda</u> warnings were printed and then one of the detectives said, "Just do me a favor, just check off in that line there where it says you understand your rights. You desire to waive these rights and talk to us right now?" Defendant responded, "Mm-mm."

Later, at about 1:22:45 p.m. on the video, a detective said to defendant, "I know you're scared now, and I know you're upset, but this is a homicide investigation . . . . This isn't – <u>this isn't</u> (indiscernible), <u>or any of that other bullshit or anything before</u>. <u>This is a homicide investigation</u> and what you have to understand is, you know, we (indiscernible)." (Emphasis added).

The prosecutor rewound the video to 1:18:48 p.m. which depicted a verbal exchange between defendant and the detectives about the events of the afternoon of the homicide. One of the detectives said:

---

[6] The sufficiency and completeness of the warnings are not at issue in this case.

Well, I guess we just charge both of you then because that's what it's starting to look like. Do you understand that? Do you understand what I'm saying to you Josh? Look at me so I know (indiscernible). Josh, do you understand me? You're going to be charged with Sedrick's homicide and you need to tell fuckin' tell us what's going on here.

(Emphasis added).

Another detective added:

We know – we know Mu killed him. The whole thing is on fuckin' film. We know that you're with him when you leave Myisha's house. (Indiscernible) calling an assassination. You shot nine times from behind. Now, you can sit here and deny all that but everything is on film. We've – we've been talking to everybody, we've talked to, like 15 people in the last few fuckin' weeks. We know everything that happened. You were the last person to be picked up, you and Mu. That's it. We don't need to get anybody else. We've already talked to everybody. Now, if you're going to just sit here and just say, no, no, no, no. I didn't know what was going on, he didn't have a gun. we can do this all night.

(Emphasis added).

On cross-examination, Lieutenant Ruga acknowledged that defendant was a "suspect" in the homicide of Lindo when they first spoke with him. When asked why he did not tell defendant about the Lindo investigation when they first arrested him in the courthouse, Lieutenant Ruga answered, "That was going

12

to be part of my introduction to the interview, so, I mean, [that's] why I didn't do it at that particular time."

Lieutenant Ruga also testified that, during the first interview, defendant said he had mouth pain and began bleeding, as a likely result of the bullet still stuck in his lung from when he was shot in the incident several weeks earlier. Lieutenant Ruga did not ask him if he wanted medical assistance.

### The Second Interview

The interview on the second day, August 28, occurred after defendant was transferred from the County Jail to the prosecutor's office and was served with homicide charges.

According to Lieutenant Ruga's testimony at the suppression hearing, before proceeding with the second interview, the officers re-read the Miranda warnings in full to defendant. In response, defendant said "[W]e can skip that." The officers did not, however, skip them, and continued with their procedure. They again presented defendant with the Miranda card, which he signed and checked off the boxes waiving his rights and agreeing to speak with them.

### The Suppression Judge's Ruling

In her oral opinion issued on May 31, 2018, the judge found that defendant's Miranda rights had not been violated during the two interrogations

and neither of the statements would be suppressed. The judge conducted a detailed totality-of-the-circumstances analysis, reviewing "both the characteristics of defendant and the nature of the interrogation," to determine the voluntariness and knowingness of defendant's waiver of his Fifth Amendment rights. Relevant parts of her analysis follow:

> [A]t the time the defendant gave his statements, he was 25 years old, had not completed high school, said he understood and read English without counsel, and he had prior contact with the criminal justice system . . . .
>
> His prior contact with the criminal justice system shows he had min – at least, had minimal knowledge of how the criminal justice process operated at the time he gave his statement.

The judge then addressed Lieutenant Ruga's, "We can do this all night," comment:

> The [c]ourt also determined that while questioning was prolonged in nature, this was done by the defendant when he gave multiple accounts of what took place. These multiple accounts also caused the detective at one point to say, again, "we can do this all night" but viewing that statement in context all – this [c]ourt has determined that it does not rise to the level of coercion or trickery because detectives knew the evidence contradicted defendant's denial.
>
> (Emphasis added).

The judge complimented the detectives' conduct during both interviews and stated, "The administration of the Miranda rights in each of these cases is a textbook example of how to do it correctly." Additionally, she noted

> Detective Ruga testified and it's shown in the interview on the video that was recorded that this defendant was read the rights from the Miranda card. He was given the card to sign. He was given the card to check off on those particular waivers.
>
> There was never an indication in either of these cases at the administration of the Miranda rights that this defendant want to – wanted to assert his right to – the right against self-incrimination.

Specifically addressing defendant's arguments about the inadmissibility of his first interview statements, the judge found that: (1) no promise was ever made by detectives to defendant constituting coercion, (2) the detective's statement, "We can do this all night" was "benign" and just a manifestation of the detectives' frustration about defendant's continuous evasiveness; and (3) the blood in defendant's mouth was not visible to the detectives and they were only made aware of it when he cited it as a reason for not wanting a soda, on his way to smoke a cigarette. The judge doubted that defendant was in real pain, enough to stop the interview, if he was able to smoke a cigarette.

Having concluded there was no constitutional violation in how the officers obtained defendant's admissions during the first interview, the judge found the

15

second confession was not tainted.  In addition, the judge found no separate constitutional violations occurred during the second interview.  Just like the first interview, defendant was informed of his rights and shown the <u>Miranda</u> card, the detectives never contradicted any of the <u>Miranda</u> warnings, and defendant did not invoke his rights at any time during the interview.  The judge interpreted defendant's statement, "[W]e can skip that," when being re-advised of his <u>Miranda</u> warnings, as "an indication . . . that he fully understood his rights to not give a statement" and noted he "seemed ready to talk even before he was given his <u>Miranda</u> rights."

<u>The Trial</u>

At trial, defendant's statements were a significant part of the State's case.  The jury was provided with transcripts of both interviews, and it watched the full video of the second interview.  A large portion of Detective Kane's and Detective Cruz's trial testimony involved clarifying defendant's statements.

Defendant did not testify on his own behalf at trial.  During closing arguments, his counsel argued that defendant only confessed on the second day of questioning because Detective Cruz was getting frustrated with him, and that he was initially afraid to speak with police because if others found out, "it could get him killed."

<u>Defendant's Contentions on Appeal Concerning the Interviews</u>

On appeal, defendant makes a different argument in advocating for the suppression of his statements. He argues he did not knowingly waive his <u>Miranda</u> rights when he made his first statement to the detectives about Lindo's murder on August 27. He argues that being told he was arrested for the traffic warrants was pretextual and a mere "ruse" to get him to speak about Lindo's murder without first obtaining a formal arrest warrant for him. Defendant asserts the detectives were required to tell him at the outset of their interaction that he was being held in custody in relation to Lindo's murder, at which they already had enough evidence to obtain an arrest warrant for him.

Defendant contends that, in actuality, he was arrested for murder, not for outstanding traffic warrants. Hence, the State allegedly violated his Fifth Amendment rights by not telling him the actual reason he was arrested before he waived his rights. Defendant argues such a disclosure was constitutionally required to enable him to "knowingly, voluntarily, and intelligently" decide whether to waive his Fifth Amendment right against self-incrimination, as established in <u>State v. A.G.D.</u>, 178 N.J. 56 (2003); <u>State v. Vincenty</u>, 237 N.J. 122 (2019); and <u>State v. Sims</u>, 466 N.J. Super. 346 (App. Div.), <u>certif. granted</u>,

17 <span>A-3417-18</span>

246 N.J. 146 (2021).[7] For these reasons, he argues the first incriminating statement he made to the officers should have been suppressed and the failure to do so constituted harmful error.

The State submits that the detectives informed defendant he was in custody for "traffic warrants" before reading him his Miranda rights for the narrow purpose to assure he knew he was not free to leave. Beyond that, the State acknowledges that "the reason why defendant was in custody is not the reason why [Lieutenant] Ruga and [Detective] Kane wished to speak with the defendant." The State maintains that defendant "no doubt was well aware that he was not being escorted to the [p]rosecutor's [o]ffice to be questioned about traffic tickets."

Defendant's argument of pretext is raised for the first time on appeal and so must be reviewed under the plain error standard. See State v. Macon, 57 N.J. 325, 336 (1971) (plain error in a jury trial must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached"); R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable

---

[7] State v. Sims was argued before the Supreme Court on October 12, 2021, and a decision has yet to be released. We have been informed that the Supreme Court has issued a stay of our judgment in Sims pending its decision.

A-3417-18

of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court."). As we now explain, we discern no such plain error under existing precedent.

Existing Case Law

The Fifth Amendment to the United States Constitution provides, in relevant part, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." This includes the right of a criminal defendant to not testify at trial, but also the right to not answer incriminating questions while a suspect, when arrested, and in other custodial settings. See In re Martin, 90 N.J. 295 (1982). Although the privilege against self-incrimination is not mentioned in the New Jersey Constitution, it has been recognized by the New Jersey Supreme Court and codified in N.J.R.E. 503.

The United States Supreme Court has given practical enforcement and protection to this Fifth Amendment right by requiring law enforcement officials to give certain well-known warnings to people in custody.[8] Miranda, 384 U.S. at 479. These warnings include:

---

[8] A defendant is in "custody" when "there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including

> [T]he right to remain silent, that anything [defendant] says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

> Ibid.

A litany of cases at the federal and state level have clarified the extent of a person's rights under the Fifth Amendment, the proper ways to exercise and invoke them, and the proper ways to waive them. The federal law provides a mandatory floor, but states are free to offer more protection to their citizens, which New Jersey does in many contexts. For example, under federal law, a person can waive their rights "provided the waiver is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444; State v. Tillery, 238 N.J. 293, 315 (2019). Under federal law, courts evaluate whether a waiver is voluntary by conducting a totality of the circumstances analysis. Miranda, 384 U.S. at 475-77.

---

the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." State v. Carlucci, 217 N.J. 129, 144 (2014) (quoting State v. P.Z., 152 N.J. 86, 103 (1997)). It is undisputed that defendant was in custody when he was interviewed in the prosecutor's office on both August 27 and 28.

Although New Jersey courts do this analysis as well, see State v. Nyhammer, 197 N.J. 383, 402 (2009), New Jersey offers more protection to its citizens by requiring law enforcement to conduct certain procedures that are not mandatory under federal law. For example, a person under arrest is "to be informed of the charge for which he [is] being placed under arrest[.]" Sims, 466 N.J. Super. at 367. The Supreme Court characterized this information as vital to making a truly knowing, intelligent, and voluntary waiver of one's right against self-incrimination. Vincenty, 237 N.J. at 125 (2019); A.G.D., 178 N.J. at 68; Sims, 466 N.J. Super. at 367-68. If these "extra" procedures are not followed, the waiver may be invalidated, regardless of the totality of circumstances. See A.G.D., 178 N.J. at 68 ("Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission.") (Emphasis added).

In A.G.D., detectives went to the home of the defendant who allegedly had sexually abused a minor. 178 N.J. at 58-59. Although they had a warrant for his arrest, the police told him they just wanted to interview him about allegations of abuse asserted against him. Ibid. The defendant voluntarily went

21

with the officers to the prosecutor's office.  Id. at 59.  Ultimately, he made an incriminating written statement and his motion to suppress was denied.  Id. at 60-61.  He was convicted at a jury trial.  Id. at 61.

On remand by the Appellate Division for a renewed Miranda hearing, the trial judge again denied A.G.D.'s motion to suppress.  Id. at 62.  On the second round of appeal, the Supreme Court reversed the defendant's conviction because the police withheld a piece of "critically important information" from him—the arrest warrant—before he waived his Miranda rights.  Id. at 68.  The Court stated that a person cannot make a knowing, intelligent, and voluntary waiver of his Fifth Amendment rights without being made aware "a criminal complaint or arrest warrant has been filed or issued" against him or her.  Id. at 68-69.

The Court illuminated in State v. Vincenty the importance of knowing one's "true status" as an arrestee for a specific crime before waiving one's Miranda rights.  In Vincenty, police officers visited the defendant who was in jail for an unrelated crime.  237 N.J. at 127.  They read him his Miranda rights and he signed an acknowledgment and waiver form.  Ibid.  The officers told him that charges were already lodged against him, and they were only seeking information about the second man he was with when he allegedly committed an armed robbery.  Id. at 127-28.  Vincenty began to answer a few of their

questions, but then expressed surprise that there were charges against him because he had not received notice of them. Id. at 128. Upon the officers showing him a list of the charges against him, he stopped answering their questions, denied involvement, and expressed concern that he wanted a lawyer. Id. at 128-29.

The Court in Vincenty expanded on the right announced in A.G.D., holding that it is not enough for law enforcement officers to tell an interrogee that any charges have been filed against him; instead, law enforcement must tell an arrestee the specific nature of the charges filed. Id. at 134.

More recently, in State v. Sims, this court applied these underlying principles from A.G.D. and Vincenty. Our majority opinion held that persons who are arrested before an arrest warrant has been issued or a criminal complaint has been filed, likewise have the right to be informed of the offenses for which they are being arrested and the charges they are facing at that moment before they waive their Miranda rights. 466 N.J. Super. at 368. As we have noted above, the Supreme Court is presently considering that holding in Sims, and a decision is still forthcoming.

Even if law enforcement officers do not commit a per se violation of a person's Fifth Amendment rights, courts will still determine whether a person's

waiver was valid by analyzing the totality of the circumstances. Tillery, 238 N.J. at 308-09, 316-19. The valid relinquishment of one's rights has two components: it (1) "must [be] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and (2) "must be made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986) (emphasis added).

The totality of the circumstances analysis depends in part on "particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused[.]" State v. Adams, 127 N.J. 438, 447-48 (1992) (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Courts must also consider "the suspect's age, education and intelligence, advice [given] as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."[9] State v. Miller, 76 N.J. 392, 402 (1978).

---

[9] Although these factors were listed in the context of determining the voluntariness of a defendant's confession, whether there has been an invalid waiver and an involuntary confession are related analytically and "[t]here is a substantial overlap between the factors that govern a court's determination of whether a Miranda waiver is valid and the factors that a court considers in its separate assessment of the voluntariness of a confession." Tillery, 238 N.J. at 316-17.

Other relevant factors in the analysis include whether police made any "(1) representations that directly conflict[] with the Miranda warnings, (2) promises of leniency by offering counseling as a substitute for jail, and (3) statements that minimize[] the seriousness of the crimes under investigation." State v. L.H., 238 N.J. 22, 47 (2019). The State must prove beyond a reasonable doubt that the suspect has voluntarily, knowingly, and intelligently relinquished Miranda rights. Adams, 127 N.J. at 447.

Defendant in this case argues that there was a per se violation of his rights because he was not told that he was arrested for Lindo's homicide, which was the "real" reason he was arrested, as opposed to the outstanding traffic warrants, before he waived his rights, therefore making his waiver not knowing, voluntary, or intelligent.

Although this present argument has some probative force, it was not raised below and thus defendant must demonstrate plain error. Moreover, no published New Jersey opinion cited to us has specifically held that if police officers have a valid outstanding warrant for a suspect's arrest on certain charges, they are constitutionally obligated to advise the arrestee that they are also interested in questioning him about another matter before imparting Miranda warnings.

The specific holdings of A.G.D., Vincenty, and Sims are not violated here, even though we acknowledge that the general principles underlying those holdings conceivably could be extended by the Supreme Court to require the police disclosures being advocated by defendant for the first time. The dimensions of such a new rule of law and whether it should apply retroactively, however, could have debatable public policy consequences for police investigations. Those consequences are best judicially assessed by our State's highest court.

At the time the police arrested and first questioned defendant on August 27, the sole authority to hold defendant in custody was the traffic-related arrest warrants. Under the case law cited by defendant, the officers were obligated to advise him of the basis for his arrest on those outstanding warrants, and they indisputably did so. The officers did not have a warrant to arrest defendant for the Lindo shooting, and it is not manifest from this record they yet had sufficient grounds to procure such a warrant, nor was the record developed to establish that assertion.

Our state's criminal case law has generally disfavored judicial inquiry into the subjective motives of law enforcement officers. See, e.g., State v. Novembrino, 105 N.J. 95 (1987) (rejecting a "good faith" exception for

violations of the exclusionary rule); <u>State v. Bruzzese</u>, 94 N.J. 210 (1983) (rejecting suppression of a police entry onto premises where the police had a valid warrant, regardless of the officers' subjective motives). The analysis under New Jersey law normally turns instead on objective standards of conduct.

In recognition of these principles and policy concerns, we decline to make new law in this case declaring the trial court committed plain error by denying defendant's suppression motion because of then-unasserted pretextual motives of the interrogating detectives. There was no "plain error" in the trial court's failure to anticipate a new rule of law that has not been promulgated, let alone argued by trial counsel.

Additionally, we adopt the trial court's conclusion that the totality of circumstances supports a finding that defendant validly waived his Fifth Amendment right against self-incrimination in both interrogations. At the first interrogation, defendant could have easily surmised that the officers were interested in speaking with him about the recent shooting and murder of Lindo. He was duly advised of his <u>Miranda</u> rights, and he waived them. He freely chose to speak at length with the officers and did not ask to cease the questioning or request counsel to be present once questioning about the Lindo murder began.

27

Having concluded defendant validly waived his rights in the first interrogation, the statements obtained from the second interrogation, were not the fruit of the poisonous tree. Moreover, he clearly waived his rights at the beginning of the second interrogation, confirming that no constitutional violation took place.

For these many reasons, we do not second-guess the trial court's determination. It is clear from the record that defendant was not misled by the police about why he was being questioned. He knowingly, voluntarily, and intelligently waived his rights in both interviews.

Accordingly, we affirm the denial of the suppression motion, based upon the current state of the law and the lack of plain error.

## III.

We need not say much about defendant's second argument, for we lack jurisdiction to entertain it. Succinctly stated, defendant wishes us to review the enforceability of a consent order that was the product of his own motion to vacate his guilty plea. Our role as a reviewing court disfavors such an undertaking, in the absence of a motion to vacate the consent order and a ruling by the trial court to either deny or grant such an application. See Winberry v. Salisbury, 5 N.J. 240, 267-68, cert. denied, 340 U.S. 877 (1950) (holding that

consent orders are generally not appealable); see also Pressler & Verniero, Current N.J. Court Rules, comment 2.2.3 on R. 2:2-3 (2021) ("A consent order is generally not appealable for the purpose of challenging its substantive provisions.").

In the present case, defendant contends he was influenced by fear and pressure from other inmates to end his cooperation agreement with the State and withdraw his guilty plea predicated on that obligation. The factual support for that claim has not been litigated or adjudicated. It would be imprudent, if not impossible, for this court to evaluate the claim without an appropriate record being developed, followed by findings of fact and conclusions of law. Without commenting here on whether it is too late for the claim to be presented to the trial court, we decline to exercise jurisdiction over the issue.

IV.

Lastly, we address defendant's argument that his aggregate forty-year sentence is excessive and unacceptably longer than the sentences imposed on the other defendants. As part of his argument, defendant contends it was improper for the court to impose consecutive terms for the murder count and the child endangerment count. We reject his arguments.

As a general matter, "when [sentencing judges] exercise discretion in accordance with the principles set forth in the Code [of Criminal Justice] and defined by [the Court] . . ., they need fear no second-guessing." State v. Bieniek, 200 N.J. 601, 607-08 (2010) (quoting State v. Ghertler, 114 N.J. 383, 384-85 (1989)); State v. Roth, 95 N.J. 334, 365 (1984) (appellate courts may not substitute their judgment for that of the sentencing court, unless the application of the sentencing guidelines to the facts makes the sentence "clearly unreasonable so as to shock the judicial conscience"). Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and -1(b), it "may impose a term within the permissible range for the offense." Bieniek, 200 N.J. at 608; see also State v. Case, 220 N.J. 49, 54 (2014).

Here, the trial court adequately explained why aggravating sentencing factors 3, 6, and 9 under N.J.S.A. 2C:44-1(a) applied, and why no mitigating factors under N.J.S.A. 2C:44-1(b) applied. Defendant has an extensive juvenile and adult criminal history that justified those findings. The consecutive ten-year sentence for the endangerment of the three-year-old child who was wounded, a separate victim, is lawful under the principles of State v. Yarbough, 100 N.J. 627 (1985). The resultant overall term of forty years was not unfair in contravention of State v. Torres, 246 N.J. 246, 272 (2021).

A-3417-18

We likewise are unpersuaded by defendant's argument of disproportionate sentencing, as compared with the other perpetrators. The other perpetrators pled guilty and, unlike defendant, did not rescind agreements to cooperate with the State. Although defendant was not the shooter, there is good cause for the sentence he received individually. State v. Hubbard, 176 N.J. Super. 174, 176 (Resentencing Panel 1980).

V.

All other arguments raised, to the extent we have not discussed them, lack sufficient merit to warrant discussion. R. 2:11-3(E)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION