835 A.2d 291

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. A.G.D., DEFENDANT-APPELLANT.

Argued September 9, 2003—Decided October 9, 2003.

*Kevin G. Byrnes,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Debra A. Owens,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Michael A. Baldassare* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Baldassare* and *Lawrence S. Lustberg,* on the brief).

Justice VERNIERO delivered the opinion of the Court.

This appeal poses two questions. The first is whether prosecutors or their representatives, including the police, properly may interrogate a suspect without the consent of defense counsel before an indictment has been obtained but after the State has filed or issued a criminal complaint or arrest warrant against that suspect. The answer to that question is yes. In view of that answer, the second question is whether the suspect's waiver of his right against self-incrimination is valid when the police fail to inform him that a criminal complaint or arrest warrant has been filed or issued against him and he otherwise does not know that fact. The answer there is no. Because the police did not so inform

defendant in this case, we hold that his waiver of rights is invalid as a matter of law. As a result, we must suppress defendant's incriminating statements given to the police.

I.

On the evening of October 8, 1993, defendant A.G.D. was babysitting his children and another minor child, K.R., the daughter of a family friend. According to K.R., who had spent the night in defendant's home as she sometimes did, during the course of the evening she awoke to find defendant engaging in oral sex with her. She later informed her mother who in turn contacted the police. In response, a detective from the county prosecutor's office conducted a videotaped interview of K.R. concerning what had transpired. Using language of a minor child, the alleged victim essentially described how defendant had performed cunnilingus on her. Based on the victim's interview, the detective obtained a warrant for defendant's arrest on February 18, 1994.

A few days later, on February 22, 1994, the detective and a fellow law enforcement officer went to defendant's home to question him. One of the detectives explained to defendant that they sought to interview him about allegations of sexual abuse that had been asserted against him, but the detective did not specify the charges. The detective neither executed the arrest warrant nor informed defendant that such a warrant had been issued. The detective's stated reason for those omissions was that he "wanted to hear what [defendant] had to say."

According to defendant, the detective informed him that he was not under arrest and that the detective wanted to conduct the interview at the prosecutor's office. At that juncture defendant's wife, who already was upset by the detectives' presence, began pleading with her husband to wait and speak with a lawyer. Notwithstanding his wife's appeal, defendant insisted that he had done nothing wrong and wanted to put an end to the matter. He then accompanied the detectives to the prosecutor's office.

The detectives' interaction with defendant prior to his giving a taped statement was not recorded, and the State and defendant proffer conflicting versions of what transpired during that period. According to the detectives, when they arrived at the prosecutor's office they escorted defendant into an interview room and, prior to any questioning, advised him of his rights as required by *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Defendant purportedly waived those rights and signed a standard *Miranda* waiver form.

After being informed of the alleged crimes and the identity of the victim who had made the allegations, defendant initially denied all charges. However, once the detectives informed defendant about K.R.'s videotaped statement, he began to make admissions. After again being informed of his rights and waiving those rights, defendant gave a written statement in which he admitted touching K.R.'s vagina with his hand, thinking that she was asleep. In response to a question, defendant stated that he "might have" performed cunnilingus on K.R. (although he later claimed that he did not understand the meaning of cunnilingus).

Defendant's version is vastly different. He disputes the voluntariness of his statements by claiming that he fabricated the story about sexually assaulting K.R. to satisfy the police. According to defendant's version, the detectives questioned him for one-and-a-half hours before presenting him with the *Miranda* waiver form. In addition, defendant asked several times whether his wife or his attorney had arrived at the prosecutor's office. Defendant claims that, in response, the detectives repeatedly informed him that he did not need a lawyer. He also claims that, after he did sign the *Miranda* waiver form, his interrogators began to curse and they threatened to put him in jail and take away his children if he did not tell them what they wanted to hear. Defendant asserts that, believing that his attorney would later set the record straight, he confessed to crimes that he did not commit.

After he finished making his written statement, defendant was arrested and transported to the county jail. A grand jury subse-

quently charged him with first-degree aggravated sexual assault, *N.J.S.A.* 2C:14–2a; second-degree sexual assault, *N.J.S.A.* 2C:14–2b; and second-degree endangering the welfare of a child, *N.J.S.A.* 2C:24–4a. (That last charge subsequently was downgraded to a third-degree offense.) The trial court conducted a pre-trial suppression hearing over a period of four days. Although one of the detectives acknowledged that some cursing had occurred during the interview, both officers denied any improper conduct. The court ultimately denied defendant's motion to suppress his statements.

At the week-long trial that followed, the State presented defendant's statements as well as other evidence. The jury convicted defendant on all counts. The trial court sentenced defendant to an aggregate term of fifteen years in prison. The court also informed defendant that he would be required to register as a sex offender under Megan's Law, *N.J.S.A.* 2C:7–1 to –19, following his incarceration.

Although defendant raised several issues before the Appellate Division, we focus solely on his claims regarding his confession. Defendant argued that formal adversarial proceedings had begun when the State issued an arrest warrant four days prior to the day on which the detectives took him into custody. He thus asserted that those proceedings triggered his right to counsel under the Sixth Amendment of the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. Defendant also claimed that the detectives had violated his rights by failing to inform him about the outstanding arrest warrant, notwithstanding his signed waiver of *Miranda* rights.

The Appellate Division rejected defendant's claims. Although acknowledging that the right to counsel under the New Jersey Constitution is broader than its federal counterpart, the panel could find "no case in this jurisdiction [holding] that the right to counsel is triggered by police questioning prior to indictment, even when that questioning is subsequent to an arrest." Regarding defendant's claim that his statements were coerced, the court

declined to rule on that question because it lacked a sufficient record from which to reach a reasoned decision. The court noted that the transcripts of the original suppression hearing did not reveal the trial court's rationale for denying the motion to suppress. The panel also noted that the trial judge who ruled on that motion had passed away and apparently had not issued a written or oral opinion.

Unable to reconstruct the record and mindful that defendant's statements were a critical part of the State's case, the Appellate Division remanded the matter for a new *Miranda* hearing. In the same unreported decision, however, the court held that defendant's conviction would stand unless a new *Miranda* hearing were decided in his favor, in which case defendant's conviction would be vacated. The panel did not retain jurisdiction.

On remand, the trial court conducted a new *Miranda* hearing, again denying defendant's motion to suppress. More specifically, the trial court disbelieved defendant's assertion that the detectives had used coercion and threatened to take away his children. The court also found that defendant had not asked to consult with an attorney or to call his wife so that she might hire an attorney. We granted defendant's petition for certification, limited to whether the State had violated defendant's rights in the period after the issuance of the arrest warrant but before the return of the indictment. 174 *N.J.* 364, 807 *A.*2d 195 (2002). We also granted *amicus curiae* status to the Association of Criminal Defense Lawyers of New Jersey (ACDL).

## II.

■ Although the first issue implicates the critically important right to counsel, its resolution is straightforward given this Court's recent case law. Briefly stated, the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." Using nearly identical language, Article I, paragraph 10 of the New Jersey Constitution provides

that same right. "The purpose of the ... right to counsel is to enable the defendant to confront the prosecution and to ensure the integrity of the judicial process." *State v. Sanchez,* 129 *N.J.* 261, 265, 609 *A.*2d 400 (1992).

As a federal mandate, the right to counsel "is triggered when 'adversary judicial proceedings have been initiated.'" *Ibid.* (quoting *Kirby v. Illinois,* 406 *U.S.* 682, 688, 92 *S.Ct.* 1877, 1881–82, 32 *L.Ed.*2d 411, 417 (1972)). Thus, the United States Supreme Court has declared that adversarial proceedings commence "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby, supra,* 406 *U.S.* at 689, 92 *S.Ct.* at 1882, 32 *L.Ed.*2d at 417. Aside from that declaration, the Supreme Court has not articulated an all-inclusive list of other criminal procedures that definitively transform the government from investigator to adversary for purposes of implicating the right to counsel. *United States ex. rel. Hall v. Lane,* 804 *F.*2d 79, 82 (7th Cir.1986) (observing that "Supreme Court has not spoken with one voice in defining which events constitute the starting points in the prosecution"); *Commonwealth v. Richman,* 458 *Pa.* 167, 320 *A.*2d 351, 353 (1974) (noting that "*Kirby* does not establish an all-inclusive rule"). That said, federal law provides that the adversarial process clearly exists following a grand jury indictment. *United States v. Wade,* 388 *U.S.* 218, 236–37, 87 *S.Ct.* 1926, 1937, 18 *L.Ed.*2d 1149, 1162–63 (1967).

The right to counsel is relevant to this dispute because when triggered, the right implicates the extent to which the police properly may obtain inculpatory statements from an accused in the absence of his counsel. For example, in *Massiah v. United States,* federal agents surreptitiously recorded a defendant's incriminating statements after the accused had been indicted, been released on bail, and had retained a lawyer. 377 *U.S.* 201, 202–03, 84 *S.Ct.* 1199, 1200–01, 12 *L.Ed.*2d 246, 248 (1964). The Supreme Court held that the agents had violated the "basic protections" of the Sixth Amendment by eliciting statements "after [the defen-

dant] had been indicted and in the absence of his counsel." *Id.* at 206, 84 *S.Ct.* at 1203, 12 *L.Ed.*2d at 250.

In a subsequent case, *Patterson v. Illinois,* the Supreme Court appeared to cabin *Massiah's* holding by rejecting the proposition that the Sixth Amendment prohibits the police from initiating post-indictment questioning of an accused until that person receives the advice of counsel. 487 *U.S.* 285, 290–300, 108 *S.Ct.* 2389, 2393–99, 101 *L.Ed.*2d 261, 271–77 (1988). Rather, the Court determined that the police in *Patterson* had not violated the defendant's right to counsel when interrogating the defendant without counsel present because the accused voluntarily had waived that right. *Id.* at 292–97, 108 *S.Ct.* at 2395–97, 101 *L.Ed.*2d at 272–75. In other words, "*Patterson* holds that after indictment, a defendant may waive his or her right to counsel under the Sixth Amendment as readily as under the Fifth Amendment." *Sanchez, supra,* 129 *N.J.* at 273, 609 *A.*2d 400.

In *Sanchez,* this Court declined to apply *Patterson's* holding to cases decided under Article I, paragraph 10 of the New Jersey Constitution. We determined that "[a]s a general rule, after an indictment and before arraignment, prosecutors or their representatives should not initiate a conversation with defendants without the consent of defense counsel." *Id.* at 277, 609 *A.*2d 400. Under that rule, courts will suppress a defendant's incriminating statements elicited during a post-indictment interrogation without counsel's consent, notwithstanding a defendant's purported waiver of rights. Such a waiver is insufficient as a matter of law under Article I, paragraph 10.

Against that backdrop, the question here is whether the rule of *Sanchez* that prohibits a waiver of rights without the consent of counsel in a post-indictment setting should be applied to the pre-indictment period in which the State has filed or issued a criminal complaint or arrest warrant against a suspect. A post-*Sanchez* case, *State v. Tucker,* 137 *N.J.* 259, 645 *A.*2d 111 (1994), provides guidance in resolving that question. In that case, the defendant argued that "the rule of *Sanchez* should be extended to protect

defendants from police-initiated custodial interrogation from the time of the first court appearance following the filing of the complaint." *Id.* at 286, 645 *A.*2d 111. Writing for a unanimous Court, Justice Stein rejected that argument, explaining in part:

> We readily acknowledge that the principle underlying our holding in *Sanchez* could logically be extended to apply to an earlier stage of criminal proceedings. Defendant argues that *Sanchez* should apply from the first court appearance following the filing of the complaint, noting that that event signals "the initiation of adversary judicial proceedings" and thus the attachment of the Sixth Amendment right to counsel. No one can dispute, however, that at the time of the first court appearance the State's investigative effort generally is at a preliminary stage . . . . We also are well aware that at the time of the first appearance the State's decision to prosecute has not solidified. Statistically, roughly one-half of all criminal complaints proceed to indictment. The remainder are either dismissed, downgraded, or diverted to Pre–Trial Intervention. Thus, the adversarial relationship between the State and defendant is not the same at the time of first appearance as it is after indictment.
>
> [*Id.* at 289–90, 645 *A.*2d 111 (internal citations omitted).]

In its brief, the ACDL cites certain statistics provided by the Administrative Office of the Courts. *Amicus* contends that those statistics demonstrate that "the State is as committed to prosecuting matters before as after indictment and, indeed, that a defendant is just as likely to have the charge dismissed, be diverted to [Pre–Trial Intervention], or be prosecuted before indictment as he is after indictment." In essence, the ACDL argues that the current data warrant a modification of the approach taken in *Tucker.* We disagree. Although the statistics might differ to some extent, *Tucker's* principles remain sound. We also explicitly based our holding in *Tucker* on more than mere statistics. We stated:

> Ultimately . . . we conclude that we should not extend our holding in *Sanchez* to defendant's first court appearance for a more basic reason. We generally apply our State Constitution under circumstances, as in *Sanchez,* in which we are convinced that it should afford greater protection to our citizens than is afforded by the Federal Constitution, and support our conclusion that greater protection is appropriate on the basis of constitutional text, legislative history, state traditions, or other factors. With respect to the protection of the right to counsel at the time of a defendant's first court appearance following the filing of the complaint, we are persuaded that the federal constitution's safeguards . . . are entirely adequate.
>
> [*Tucker, supra,* 137 *N.J.* at 291, 645 *A.*2d 111 (internal citations omitted).]

As noted, the period at issue in *Tucker* was the defendant's first court appearance following his arrest. We find no compelling basis for extending *Sanchez* to the period at issue here, when an interrogation takes place earlier in the process. We acknowledge that, to harmonize our law with federal safeguards, *Tucker* prompted a revision to *Rule* 3:4–2 to require a judge at the first court appearance to inquire whether a defendant wants counsel. We are satisfied that existing procedures adequately protect a suspect in the period prior to his first court appearance without a need for the additional requirements of *Rule* 3:4–2 in that prior period. Accordingly, we conclude that prosecutors and their representatives, including the police, properly may interrogate a suspect without defense counsel's consent before an indictment has been obtained but after the government has filed or issued a criminal complaint or arrest warrant against that suspect.

## III.

█ The remaining issue focuses on whether defendant's waiver of his right to remain silent was valid in view of the fact that the detectives did not inform him that an arrest warrant had been issued against him. At the federal level, the right against self-incrimination most notably derives from the Fifth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment. *State v. P.Z.*, 152 *N.J.* 86, 100–01, 703 *A.*2d 901 (1997). As an independent source of protection, New Jersey common law has accorded its citizens their right against self-incrimination since colonial times. *Id.* at 101, 703 *A.*2d 901; *see also State v. Reed*, 133 *N.J.* 237, 250, 627 *A.*2d 630 (1993) (observing that "[f]rom its beginnings as a State, New Jersey has recognized the right against self-incrimination and has consistently and vigorously protected that right").

More specifically, Justice Clifford has described the right as "an integral thread in the fabric of New Jersey common law since our beginnings as a state." *State v. Hartley*, 103 *N.J.* 252, 286, 511 *A.*2d 80 (1986). The right was first codified by statute as early as

1855, *Reed, supra,* 133 *N.J.* at 250, 627 *A.*2d 630, and subsequently has been made a part of the New Jersey Rules of Evidence. *N.J.R.E.* 503. We recently declared that "[t]he privilege against self-incrimination ... is one of the most important protections of the criminal law." *State v. Presha,* 163 *N.J.* 304, 312, 748 *A.*2d 1108 (2000). Consistent with that declaration, "we have held that the New Jersey common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege." *In re Grand Jury Proceedings of Guarino,* 104 *N.J.* 218, 229, 516 *A.*2d 1063 (1986).

■ "The Court has thus actively embraced the opportunity to move beyond the guidelines of federal directives in pursuit of an unyielding commitment to ensure the proper admissibility of confessions." *Reed, supra,* 133 *N.J.* at 252, 627 *A.*2d 630 (internal quotations and citations omitted). Within that context, "a suspect is always free to waive the privilege and confess to committing crimes[.]" *Presha, supra,* 163 *N.J.* at 313, 748 *A.*2d 1108. Howeverer, "for a confession to be admissible as evidence, prosecutors must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." *Ibid.* (citing *State v. Burris,* 145 *N.J.* 509, 534, 679 *A.*2d 121 (1996); *State v. Kelly,* 61 *N.J.* 283, 294, 294 *A.*2d 41 (1972)).

■ As a general rule, "[i]n determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of circumstances surrounding the arrest and interrogation[.]" *Ibid.* We have, on occasion, departed from that rule and applied a different standard. For example, in the case of juveniles under the age of fourteen, the traditional totality-of-circumstances test is insufficient to determine whether the statements of such youthful offenders are admissible. *Id.* at 308, 748 *A.*2d 1108. An adult's absence will render the confession of a juvenile under that age "inadmissible as a matter of law, unless the parent or legal guardian is truly unavailable." *Ibid.* A young juvenile's immaturity so limits his ability to make a knowing and intelligent waiver

of rights that an added layer of protection is required. *Id.* at 315–16, 748 *A*.2d 1108.

Although clearly not limited by age or immaturity, defendant was disadvantaged by a lack of critically important information. The government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights. Although they are insufficient to require application of *Sanchez* for the reasons already stated, a criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability. Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission.

 Our approach here is analogous to the approach taken in respect of New Jersey's administration of the so-called "target doctrine." Under the general contours of that doctrine, an individual being questioned before a grand jury who is also the target of the investigation must be advised of that fact in addition to receiving *Miranda* warnings. *State v. Vinegra*, 73 *N.J.* 484, 490, 376 *A*.2d 150 (1977). Knowing one's "target" status is essential "in order for the witness to intelligently determine whether he/she wishes to exercise [his or her] constitutional rights[.]" 31 *New Jersey Practice, Criminal Practice and Procedure* § 10.35 at 426–27 (Leonard N. Arnold) (2002). As with the rule announced today, "[t]he common law privilege against self-incrimination in New Jersey as expounded in our target doctrine seems to afford greater protection than that given by the Fifth Amendment." *Vinegra, supra,* 73 *N.J.* at 490, 376 *A*.2d 150.

Our holding is not to be construed as altering existing case law in respect of the manner in which the police conduct interrogations other than imposing the basic requirement to inform an interrogatee that a criminal complaint or arrest warrant has been filed or

issued. In that regard, we do not perceive our holding as unduly burdening existing police practices. In sum, we are constrained to suppress defendant's statements and, in so doing, to reverse his conviction in view of his state-law right against self-incrimination to which he was entitled but denied for the narrow reasons expressed above.

## IV.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—7.

*Opposed*—None.