**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1281-21

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

ADRIENNE L. HREHA,

    Defendant-Respondent.

_____

Submitted September 19, 2022 – Decided October 20, 2022

Before Judges Currier and Enright.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-02-0298.

Bradley D. Billhimer, Ocean County Prosecutor, attorney for appellant (Samuel Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, Supervising Assistant Prosecutor, on the briefs).

Alton D. Kenney, attorney for respondent.

PER CURIAM

On leave granted, we consider the trial court's order that granted defendant's motion to exclude her statements made to police. The State contends it did not have sufficient information to charge defendant with strict liability for drug-induced death, N.J.S.A. 2C:35-9, prior to the interrogation. In considering the totality of the circumstances, we conclude the detectives were aware of facts constituting probable cause that defendant committed the offense but instead told her repeatedly they were only pursuing a "narcotics investigation." As a result, the State did not establish that defendant knowingly waived her right against self-incrimination. We affirm.

We derive our facts from the evidence elicited during the suppression hearing.

On Sunday October 29, 2017, the Toms River Police Department called in a "death investigation" to the Major Crimes Unit of the Ocean County Prosecutor's Office, which investigates homicides and other high-profile crimes, including strict liability deaths. Detective Brant Uricks was the night duty supervisor for the Major Crimes Unit at the time. He directed another detective to respond to the call.

During his testimony at the suppression hearing, Uricks stated the investigation involved the death of Richard Frommann, who had a known

2

history of drug abuse. Police had found seven wax folds of heroin, on which was stamped "Hype" in red ink, along with half cut straws next to Frommann's body. The prosecutor's detective reported to Uricks that no foul play was suspected, and that a drug overdose was the likely cause of death. Based on Frommann's history of drug abuse, and the proximity of the heroin to his body, Uricks also thought it appeared to be a drug-induced death.

Uricks determined that the next course of action was to "find the dealer of that heroin." Uricks obtained Frommann's cell phone and retrieved text messages between Frommann and defendant, which included "drug-related lingo," such as "ski," referring to cocaine, and "bunny," referring to ten bags of heroin. Uricks stated the text messages confirmed that defendant purchased and delivered the heroin to Frommann. As a result, Uricks stated defendant was "a suspect in a strict liability death" investigation.

"As is common with these investigations," Uricks explained he then messaged defendant using Frommann's phone so defendant would think Frommann was sending the text messages. Uricks said his purpose was "to recover more of the same drug that was found on scene," and to "confirm that this was the person that sold the drugs to [Frommann]." He stated if he could prove that the heroin caused Frommann's death, and he "could get evidence that

3

a certain person sold that heroin to [Frommann], that would constitute a strict liability drug-induced death." Through the messages, Uricks tried "to buy the same drugs that were found on scene," namely heroin, but defendant said she did not have any. Believing the messages were from Frommann, defendant agreed to sell him Xanax, so that he would not "go through withdrawals."

Uricks arranged an exchange with defendant for November 1, 2017, to occur at a local store. Toms River Police Department Detective Bucci was at the location and arrested defendant upon her arrival. Uricks arrived on the scene shortly after the arrest and was told law enforcement had read defendant her Miranda[1] rights and informed her she was being arrested "[f]or the Xanax."

On November 1, 2017, defendant was charged in a complaint-summons with third-degree possession of a prescription legend drug (Xanax) with intent to sell, N.J.S.A. 2C:35-10.5(a)(3); and possession of hypodermic syringe or needle, a disorderly persons offense, N.J.S.A. 2C:36-6(a).

After her arrest, defendant was interviewed by Uricks and Bucci at the Toms River Police Department. Uricks read defendant her Miranda rights a second time and reviewed the Miranda waiver form with her. Defendant read a

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

portion of the form aloud, stating that she understood her rights, was willing to answer questions without an attorney present, and understood that she could stop answering questions at any time.

Uricks then commenced the questioning, stating "obviously you know you were stopped in the parking lot. You knew it was a narcotics investigation because . . . the police officers had jumped out of the car." He then said, "what we're doing here right now is working on your narcotics investigation." Defendant told Uricks she had five "bars" of Xanax on her, which she planned to sell to Frommann. She stated that her boyfriend had asked her to help Frommann out, because "[Frommann] was trying to get off dope or whatever."

Defendant said that when Frommann initially reached out to her, she did not want to get "involved in anything" because she was "trying to stay out of trouble." She initially denied selling Frommann heroin or anything other than Xanax but later said she sold him "coke," explaining that she also used cocaine, so she had purchased extra for him and he then "reimbursed" her. However, she did not intend to sell Frommann anything else but Xanax on November 1.

Defendant admitted she used heroin in the past and detailed her substance abuse history. When asked about the hypodermic needles found in her truck,

5

defendant admitted to "shoot[ing] coke," and stated that it was "every once in a while."

In returning to the investigation, Uricks told defendant that, "the reason we were asking about Sunday [October 29], you already know that [Frommann] is a part of the investigation . . . we have the text messages between you guys." He stated that, in those messages, she had referenced selling Frommann "a certain amount of heroin." Defendant responded "[y]eah." Uricks then read the text message exchange to defendant and confirmed that Frommann had purchased a "12" of heroin for $80. Uricks then asked if she recalled the "stamp" on it, asking if it was "Hype." Defendant responded "[y]eah," and said "[c]ause I'm remembering he said let's meet today. He said Hype was good stuff or somethin'."[2] Uricks then asked "is that the one that you . . . you had on Sunday, was [H]ype? Red—red stamp?" Defendant responded "Yeah. . . . It was the red one."

Uricks then told defendant that "[t]he reason that we're here is . . . we're trying to—obviously, it's—it's—it's a narcotics investigation at this point," but that they were "tryin' to get . . . to the next level," because they could tell that she was not "the kingpin." Defendant denied that she was the kingpin or

---

[2] This message was likely sent by Uricks while impersonating Frommann.

involved with arranging any shipments of drugs from outside the country. She then began speaking about Frommann, stating that it "was weird" when Frommann asked for "dope" because as far as she knew, he only used coke. She thought he might have relapsed, and so she asked around and purchased the heroin from "a friend of a friend." She had "fronted the money," purchasing a "12" for $70, and selling it to Frommann for $80. When Uricks again asked defendant about the seller of the heroin, she reiterated that she bought the heroin from a friend, who had picked it up from the dealer. She told the detectives several times that she did not know who the dealer was.

After a break, defendant identified a photograph of Frommann. Bucci then stated, "Well, this might be—you know, it's something that just a—a regular dealing kind of case that you don't really think is that really important or something like that. But it's just about to get real real for you." The following exchange then occurred:

> [Uricks]: All right. So I told you I'm from the Ocean County Prosecutor's Office. Right? I'm not from the Narcotics Unit. . . . I'm from . . . the Homicide, Major Crime, Homicide Unit, and the reason I'm here is because [Frommann] is dead.
>
> [Defendant]: No he's not.
>
> [Uricks]: Yes, he is. And the reason that he's dead, as of right now——again he's still going for a medical

exam, but . . . next to him were the folds of heroin with the stamp on it. So as of right now, this is being investigated as a drug-related death.

[Bucci]: [Frommann] died on Sunday.

[Uricks]: A very short time after you dropped the heroin off to him. You understand how serious this investigation is right now?

Uricks then told defendant, "[A]s of right now, the seriousness of this investigation is more than the . . . conspiracy to distribute CDS," and that it was "a strict liability investigation, potentially," and "[t]hat's what we're working right now." He then said strict liability was "a manslaughter case. . . . under the homicide statutes." Uricks explained to defendant that

> if somebody dies and it's ruled a drug-related death and . . . in this case the heroin is the drug that killed him, then the person that sold him that drug is on the hook for strict liability, drug-induced death, which is a manslaughter charge, which is a lower charge . . . [than] murder . . . This is very very serious.

He stated that they needed "to move quickly to try to get the dealer involved . . . " and that "the only way that we can try to shift some of this onto someone else is if we can get the dealer and that's all up to you." Uricks said they could "close this case right now and say [defendant] [was] the person that sold [Frommann] the heroin," but they were "trying to throw [her] [a] life raft" and identify the dealer.

8

After repeated questioning and encouraging defendant to arrange a transaction with the dealer, defendant agreed that she could try. The detectives then proposed setting her up to buy more "red Hype" from the same person, with the detectives monitoring the exchange. Defendant eventually stated she had purchased the heroin from "Dee"[3] whom she knew through friends.

After a break in the interview, during which police retrieved defendant's cell phone from her car, Bucci reminded defendant she had the right to remain silent, and she agreed to continue to speak to the detectives. Her phone contained messages between her and Dee between October 31 and November 1, 2017. Defendant informed the detectives she sold heroin to Frommann and another person. She identified Dee in a picture. As the detectives attempted to elicit more information about Dee, Bucci told defendant to "keep in mind that, you know, this isn't like you just got caught sellin' some zany bars and, you know, I mean, you understand the significance of this." The interview concluded with the detectives asking her to consider setting up a call with Dee to get the Hype. They advised her she would be processed on the pills and needles charges and would be released. The detectives stated the next action

---

[3] Defendant initially referred to him as "Dave" and then "Dee."

was up to her—whether she would cooperate with law enforcement in arranging a transaction with Dee.

During cross-examination, Uricks agreed it was reasonable for defendant to believe she was being arrested only for attempting to sell Xanax. Uricks conceded that, from the start of the interview, defendant was led to believe the detectives were engaging in a "[n]arcotics investigation." He stated that he chose those words intentionally, so defendant would not be aware that it was a death investigation.

The following exchange occurred:

> [Defense Attorney]: Okay. So when she was taken into custody, it's reasonable for her to believe she's being arrested for Xanax, right?
>
> [Uricks]: Yes.
>
> [Defense Attorney]: And you deliberately withheld any further information about other potential charges from her, correct?
>
> [Uricks]: We couldn't charge her with that at that time.
>
> . . . .
>
> [Defense Attorney]: She ha[d] at all times been led to believe this is a narcotics investigation dealing with her having Xanax to distribute?
>
> [Uricks]: Correct.

[Defense Attorney]: Okay. Now did you tell her that she was potentially facing charges of manslaughter and or strict liability when she was Mirandized?

[Uricks]: No.

[Defense Attorney]: You withheld that?

[Uricks]: Correct.

[Defense Attorney]: And you did that intentionally?

[Uricks]: Yes.

[Defense Attorney]: Okay. And did you do that so she would continue to speak to you? That's a yes or no.

[Uricks]: Yes.

[Defense Attorney]: Okay. So you knew there was a potential charge here for strict liability?

[Uricks]: Possibly.

 . . . .

[DEFENSE COUNSEL]: The focus of the investigation and the focus of the questioning had everything to do with what her prior dealings were about heroin, right?

[URICKS]: Yes, sir. Yeah, this was a strict liability –

[DEFENSE COUNSEL]: You wanted an admission from her about the distribution of the heroin that you believe[d] caused Mr. Frommann's death.

[URICKS]: Absolutely.

A-1281-21

Uricks conceded he told defendant "as a fact" that Frommann died from the heroin she sold to him. Because of the text messages, Uricks agreed he had a suspect in a strict liability case on October 30, before defendant's interview.

However, even at the conclusion of the interview, defendant was not charged with strict liability drug-induced death because the detectives stated there was not enough evidence to establish causation for the charge. Specifically, Uricks stated he needed the results of the toxicology report and the medical examiner's reports to establish that the heroin sold by defendant was the sole cause of Frommann's death. He explained that a strict liability charge can only be filed after the autopsy of the body and a toxicological analysis of the drugs are completed, to confirm that the decedent "would be alive, but for those compounds in their blood." Nevertheless, Uricks assumed that the heroin was the cause of death, because "there was [sic] no other drugs and no trauma to him," thus there was "a good chance" that it caused Frommann's death.

On February 26, 2019, defendant was charged in an indictment with numerous drug-related charges and first-degree strict liability drug-induced death of Richard Frommann, N.J.S.A. 2C:35-9.

On November 22, 2021, the trial judge issued a written decision and order granting defendant's motion to suppress her recorded statements to police.

A-1281-21

The trial court held that defendant's "purported waiver of her right against self-incrimination was not made knowingly, intelligently, and voluntarily because the police did not inform [d]efendant [of] the true nature of her arrest, which was the homicide investigation." The trial court stated that, when reviewing the voluntariness of a Miranda waiver, it must consider the totality of the circumstances and that "[t]he failure to be told of one's suspect status may be relevant under the totality of the circumstances." The court also referenced the holding in State v. Vincenty, 237 N.J. 122, 126 (2019), that "interrogation officers must not only inform a suspect that an arrest warrant or complaint has been issued or filed but also notify the suspect of the charges." (emphasis in original). The court cited to this court's holding in State v. Sims, 466 N.J. Super. 346 (App. Div. 2021), rev'd, 250 N.J. 189 (2022),[4] noting it "applied the holdings of A.G.D.[5] and Vincenty to situations where the police have probable cause to arrest a suspect, but no formal charges have been filed."

The court initially noted that "[d]efendant's arrest for [the] Xanax-related offense appears to have been a police tactic calculated to lull [defendant] into a

---

[4] After the trial court issued its order, the Supreme Court reversed the Appellate Division's holding in Sims, 250 N.J. at 189.

[5] State v. A.G.D., 178 N.J. 56 (2003).

false sense of repose." The court described the detectives' tactics during the interview, including repeating that they were conducting a "narcotics investigation," and Uricks's acknowledgment that he intentionally withheld the possible drug-induced death charge from defendant. The court found that "[d]efendant was deliberately kept in the dark about her true status even though the veil of suspicion had draped over her already." (citing A.G.D., 178 N.J. at 68). The court concluded that "[t]o permit the police to question [d]efendant about the circumstances of a charge for which she has not yet been formally arrested, but police are aware is forthcoming, contravenes the standards announced in A.G.D., Vincenty, and Sims and basic principles of fundamental fairness."

We granted the State leave to appeal. The State raises the following contention for our consideration:

> THE COURT ERRED [IN] ITS RELIANCE ON THE DECISION IN STATE V. SIMS TO INCLUDE THE NECESSITY TO INFORM A SUSPECT OF THE FACTS OF AN INVESTIGATION TO WHICH HE IS MERELY A SUSPECT WHEN ARRESTED ON OTHER CHARGES

When reviewing a motion to suppress, we generally "defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." Sims, 250 N.J. at 210. Deference to a trial court's

14

factual findings is appropriate because the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). The trial court's legal conclusions, however, are reviewed de novo. State v. Hubbard, 222 N.J. 249, 263 (2015). Thus, we are not bound by "[a] trial court's interpretations of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The State contends the trial court erred in suppressing defendant's statements. Although defendant was a suspect in a drug-induced death investigation, the State asserts she was not entitled to know her suspect status for that offense because, at the time of her interview, the detectives did not have sufficient evidence to arrest her for that crime. The issue before this court then is whether defendant's waiver of her Miranda rights was knowing, voluntary, and intelligent, given that, at the time of her purported waiver, she was only under arrest for drug charges and was unaware that she also was a suspect in a drug-induced death investigation.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now

15

embodied in statute, N.J.S.A. 2A:84A-19, and . . . N.J.R.E. 503." S.S., 229 N.J. at 381. "To ensure that a person subject to custodial interrogation is 'adequately and effectively apprised of his rights,' the United States Supreme Court developed constitutional safeguards–the Miranda warnings." State v. A.M., 237 N.J. 384, 396 (2019) (quoting Miranda, 384 U.S. at 467). Accordingly, "a defendant must be informed that he has the right to remain silent, that anything he says can and will be used against [him] in court, and that he has the right to have counsel present at the interrogation." Id. at 396-97 (internal quotations omitted).

The State must prove beyond a reasonable doubt that the waiver of Miranda rights was given knowingly, voluntarily, and intelligently. State v. Nyhammer, 197 N.J. 383, 400-01 (2009). A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances." A.M., 237 N.J. at 398. The totality of the circumstances "requires that we 'consider such factors as the defendant's age, education, and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Sims, 250 N.J. at 217 (quoting Nyhammer, 197 N.J. at 402).

In A.G.D., the Court departed from the totality-of-the-circumstances rule and set forth a per se rule that police officers must inform a suspect that a criminal complaint or arrest warrant has been filed or issued prior to interrogation. 178 N.J. at 68-69. In that case, the detectives went to interview the defendant "about allegations of sexual abuse that had been asserted against him," but, notably, "did not specify the charges" and did not notify him that a warrant for his arrest had been issued. Id. at 59. The defendant agreed to speak with the police and, after initially denying any wrongdoing, admitted to sexually abusing the child-victim. Id. at 59-60. At the end of the interrogation, the defendant was arrested. Id. at 60.

The Court stated that, "[a]s a general rule, '[i]n determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of circumstances surrounding the arrest and interrogation.'" Id. at 67 (quoting State v. Presha, 163 N.J. 304, 313 (2000)). However, the Court stated that it has, "on occasion, departed from that rule and applied a different standard." Ibid. The Court held that such a deviation was appropriate in A.G.D., because the detectives' failure to inform the defendant about the warrant for his arrest deprived him "of information indispensable to a knowing and intelligent waiver of rights." Id. at 68.

The Court explained:

> [A] criminal complaint and arrest warrant signify that a veil of suspicion is about to be draped on the person, heightening his risk of criminal liability. Without advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission.
>
> [Ibid.]

Consequently, the Supreme Court held that, to make a knowing and intelligent waiver of the right to remain silent, the defendant must be aware of his "true status" in a criminal investigation. Ibid. However, the Court limited its holding, stating that it was not meant "to be construed as altering existing case law," but rather to "impos[e] the basic requirement to inform an interrogatee that a criminal complaint or arrest warrant has been filed or issued." Id. at 68-69.

The Court also limited the applicability of A.G.D. in Nyhammer, 197 N.J. at 404-05. In that case, the defendant had reported to the Division of Youth and Family Services that his uncle had sexually abused the defendant's niece, and he agreed to speak to a detective regarding the allegations. Id. at 389-90. In arranging the interview, the detective did not inform the defendant that the child had also made allegations against him. Id. at 390. After waiving his Miranda rights, the defendant informed the detective about his observations of his uncle and his niece. Id. at 391. The detective then disclosed that the child had also

18

named the defendant as her abuser, and the defendant admitted to the allegations. Id. at 391-92.

In reviewing the voluntariness of the waiver, the Court applied the "traditional totality-of-the-circumstances test." Id. at 404. In applying this standard, the Court noted that, "[i]n the typical case, explicit knowledge of one's status as a suspect will not be important for Miranda purposes," but that "the failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances." Id. at 407. The Court distinguished the facts from those in A.G.D., where a criminal complaint and an arrest warrant had already been issued, and the defendant "was purposely kept in the dark by his interlocutors of this indispensable information." Id. at 404-05. Nyhammer, in contrast, involved an uncharged suspect at the time of the Miranda waiver and interrogation. Id. at 405.

The Court stated:

> Unlike the issuance of a criminal complaint or arrest warrant, suspect status is not an objectively verifiable and discrete fact, but rather an elusive concept that will vary depending on subjective considerations of different police officers. A suspect to one police officer may be a person of interest to another officer.
>
> [Ibid.]

Consequently, the Court held that, absent "compelling reasons," the appropriate inquiry is "whether the failure to advise an individual that he is a suspect at the time he is read his Miranda warnings should be a factor in the totality-of-the-circumstances test." Id. at 405.

In Vincenty, 237 N.J. at 134, the Court expanded the A.G.D. principle, finding that interrogating officers must not only inform a defendant that an arrest warrant or complaint has been issued or filed, but must also notify them of the "essence of the charges." In that case, police officers visited the defendant in prison and asked to question him about an attempted robbery and attempted murder. Id. at 126. After the defendant waived his Miranda rights, the detectives informed him they had identified him from the video of the attack, and needed his help in identifying the second assailant. Id. at 127. The detectives then told the defendant that "the judge already charged [him]," because his DNA had been found on a mask recovered at the scene of the attack. Ibid. The defendant expressed confusion and denied any involvement. Id. at 128. As the detectives continued to question defendant about the second assailant, he gave brief answers, and denied his involvement. Ibid. When the detectives again mentioned the charges against him, in response to the defendant's questions, the detectives showed him a list of the charges against

him. Ibid. The defendant again denied involvement, and, shortly thereafter, asked to speak to a lawyer, "express[ing] concern that there were charges pending against him." Id. at 129.

The Court held that the defendant's interrogation "is precisely what A.G.D. prohibits," in that "suspects cannot knowingly and intelligently determine whether to waive their rights against self-incrimination if, when making that determination, they have not been informed of the charges filed against them." Id. at 134. The Court noted that, while the defendant initially was willing to speak to law enforcement, once he was informed of the charges against him, "his willingness to speak with the detectives dissipated," and "[h]e was no longer willing to waive his right against self-incrimination." Ibid. The Court concluded that the detectives withheld "critically important information" which "deprived [the defendant] of the ability to knowingly and voluntarily waive the right against self-incrimination." Id. at 135.

Most recently, the Court's decision in Sims, 250 N.J. at 212-16, clarified the limited applicability of A.G.D. and its progeny. In Sims, the defendant was arrested for attempted murder prior to the issuance of a complaint, warrant, or the filing of any formal charges. Id. at 199. While being arrested, the defendant asked, "what was going on and why he was being placed under arrest," and the

21

detectives responded that they "'would get into the details' when they reached the prosecutor's office." Ibid. In the interview room, the detectives read the defendant his Miranda rights, and Sims again asked "[s]o I'm under arrest or something?" and the detectives responded in the affirmative. Ibid. The defendant then waived his rights and agreed to be questioned. Ibid.

In its decision, this court held that, upon arrest, "a defendant must be advised of the 'actual' and 'specific' charges he is facing," regardless of whether charges were filed against him. Sims, 466 N.J. Super. 34 at 367. The panel noted that its holding was "limited to requiring that the interrogating officer inform the arrested interrogee of the charge that, at the time of arrest, the officer had probable cause to believe defendant committed." Id. at 368, n.7. The Supreme Court reversed. Sims, 250 N.J. at 197.

The Court stated that "[o]nly in the most limited circumstances have we applied a per se rule to decide whether a defendant knowingly and voluntarily waived Miranda rights." Id. at 211-12 (quoting Nyhammer, 197 N.J. at 403). Absent such limited circumstances, the general rule was to view the totality of the circumstances surrounding the waiver. Ibid. Comparing its ruling in A.G.D. with the Appellate Division's holding in Sims, 466 N.J. Super. at 379-86, the Supreme Court articulated that "[t]he rule of A.G.D. mandates disclosure of

factual information about pending charges that the officer can readily confirm and clearly convey." Id. at 214. This is because "[a] complaint-warrant or arrest warrant notifies an interrogating police officer that a judge, or other judicial officer, has found probable cause with respect to one or more charges." Id. at 214-15. Thus, the Supreme Court stated:

> The rule announced in A.G.D. is clear and circumscribed. If a complaint-warrant has been filed or an arrest warrant has been issued against a suspect whom law enforcement officers seek to interrogate, the officers must disclose that fact to the interrogee and inform him in a simple declaratory statement of the charges filed against him before any interrogation.
>
> [Id. at 213.]

The Court held that this court's "expansion of the rule stated in A.G.D. is unwarranted and impractical." Id. at 214

Therefore, the Court rejected the application of a bright-line rule to the facts before it, and instead applied the totality-of-the-circumstances approach. Id. at 217. In doing so, it reversed the Appellate Division's decision, and affirmed the trial court's denial of defendant's motion to suppress his statements. Ibid. It also addressed the defendant's concern that such a ruling could result in "bad-faith conduct" by law enforcement—such as delaying seeking a complaint-warrant to avoid disclosing the charges to the arrestee—and stated that this type

23

of behavior should be considered by the trial court "as part of the totality-of-the circumstances test." Id. at 216.

We also consider a recent case decided by this court as it involves facts and circumstances almost identical to those presented here. In State v. Diaz, 470 N.J. Super. 495, 503-04 (App. Div. 2022), law enforcement responded to a "possible drug overdose," where it appeared that decedent had overdosed on heroin. The detectives arranged for the decedent's roommate to purchase the same heroin from the same dealer, resulting in defendant's arrest. Id. at 505-06. When the defendant asked the reasons for his arrest, a detective responded that they were "conducting an investigation involving narcotics." Id. at 506.

Following the defendant's waiver of his Miranda rights—during which the detectives did not specify any potential criminal charges or otherwise indicate what the interrogation was about—the defendant answered the detectives' questions and admitted to providing the decedent's roommate with heroin. Id. at 507. After the defendant made this admission, "the tenor and substance of the stationhouse interrogation changed," and the detectives stated that they were investigating a strict liability drug-induced death and encouraged the defendant to disclose his dealer. Id. at 507-08. The defendant subsequently was charged by complaint-warrant with drug related offenses, and, two months later, was

indicted in a ten-count indictment, including first-degree strict liability for drug-induced death.  Id. at 508-09.

Diaz was decided prior to the Supreme Court's decision in Sims.  The panel did not rely on this court's Sims holding.  Instead, the court assessed the "totality of the relevant circumstances," and "focus[ed] on whether the State proved beyond a reasonable doubt that defendant knowingly waived his right against self-incrimination in view of the detectives' stratagem to withhold the fact that someone had died following defendant's act of distributing heroin to [the decedent's roommate]."  Id. at 518.  The court found that "the detectives in this case affirmatively misled defendant as to his 'true status' by providing a deliberately vague and incomplete answer to his question as to the reason why he was taken into custody."  Ibid.

The court determined that "a reasonable person . . . would interpret the detective's response [that they were conducting a narcotics investigation] to mean, as defendant believed, that he had been taken into custody for possessing and distributing drugs, not for committing a homicide."  Id. at 519.  The court expressed significant concern regarding the detectives' "trickery," because such trickery was "part of the waiver process," and thus was "designed to induce a person to yield his or her right to remain silent."  Id. at 525.  The court stated:

The reasonably likely if not intended effect of that artifice was to lead defendant—at the critical moment he waived his Fifth Amendment rights—to believe that he had been arrested for a less serious offense than strict liability homicide.

It is one thing for police to withhold information. It is another thing entirely for them to provide an explanation that creates or reinforces a false impression as to the seriousness of the sentence that a defendant is facing. Any such deception or trickery as to the true reason a defendant is taken into custody, whether made in response to a question posed by the defendant, as in this case, or made on the police interrogator's own initiative, is an important circumstance to be considered as part of the totality of circumstances when determining whether the State has proved beyond a reasonable doubt that the defendant made a knowing and voluntary waiver of the right against self-incrimination.

[Id. at 518-19.]

Moreover, looking at the totality of the law enforcement's behavior—in setting up the exchange between the defendant and the decedent's roommate and intercepting the defendant while on route to the exchange—the court found that "this was a carefully orchestrated warrantless arrest as part of the ongoing homicide investigation." Id. at 519-20.

The court also addressed whether the detectives had an obligation to inform defendant about the drug-induced death charge, given their claim that they did not have probable cause to charge defendant with that crime, as the

26

autopsy and toxicology reports were still pending. Id. at 527. The court found that, "at the time defendant was taken into custody, the detectives were aware of facts that, viewed collectively, would lead an objectively reasonable police officer to believe that defendant was criminally responsible for the victim's death." Id. at 528. Although it recognized that the autopsy and toxicology reports were not yet available and likely would be necessary to prove drug-induced death beyond a reasonable doubt at trial, it stated that "such forensic evidence was not needed to meet the far lower probable cause standard of proof." Ibid. Moreover, it did not pay much heed to the fact that the defendant only initially was charged with the lesser offenses by complaint-warrant, and later was indicted for strict liability homicide, stating that such decisions were the "prosecutor's prerogative." Id. at 532.

Therefore, this court held that the defendant's incriminating statements should be suppressed "because the detectives deliberately and affirmatively misled him as to the potential sentencing consequences of his waiver of the right against self-incrimination, leading [the court] to conclude that the State failed to prove beyond a reasonable doubt that defendant's waiver of his right against self-incrimination was made knowingly." Id. at 533.

This review of applicable caselaw renders it apparent that the bright line rule expressed in A.G.D. and its progeny is limited to situations where law enforcement fails to disclose the actual charges filed against the suspect. Sims, 250 N.J. at 213-14; Vincenty, 237 N.J. at 126; A.G.D., 178 N.J. at 68. Otherwise, when reviewing the voluntariness of a Miranda waiver, a court must consider whether the State has satisfied its burden of proof by considering the "totality of the circumstances." Sims, 250 N.J. at 217.

When considering the totality of the circumstances of a Miranda waiver, courts may consider acts of intentional wrongdoing by law enforcement, including an intentional failure to file charges in order to keep an arrestee in suspect status, Sims, 250 N.J. at 216, and the "failure to be told of one's suspect status," Nyhammer, 197 N.J. at 407. In Diaz, we found that a court may consider law enforcement's "investigative stratagem" to allow the defendant to believe they were arrested "for a less serious offense" and "withhold information concerning [an] overdose death" until after the defendant admits to selling the underlying controlled substance, thereby implicating themselves on the more serious charge. 470 N.J. Super. at 518-19.

Here, it is clear law enforcement used an intentional investigative stratagem to mislead defendant regarding her "true status" as a suspect in a drug-

induced death case, and to incentivize her to name her supplier. This is evident from the start of the investigation.

Immediately following Frommann's death, the on-scene officers called in a "death investigation" to the Major Crimes Unit of the Ocean County Prosecutor's Office which investigates "[s]uspicious deaths." The unit's involvement was triggered due to the circumstances surrounding Frommann's death, namely that he had a history of drug abuse, was found dead next to packets of heroin, and no foul play was suspected. Uricks admitted that from the start, he was investigating a strict liability drug-induced death. And based on the text messages between defendant and Frommann, defendant was the identified suspect.

As Uricks described, the next step in the drug-induced death investigation was to identify the dealer of the heroin and "recover more of the same drug that was found on [the] scene." The purpose of this course of action was to establish the elements of drug-induced death and connect the suspect to the drugs that caused the death in question.

As in Diaz, the "plan was not designed merely to intercept defendant in possession of a small quantity [of drugs]. Rather, the planned arrest was intended to advance the overdose death investigation." 470 N.J. Super. at 520.

29

Here, in setting up the exchange between defendant and the undercover officer, the goal was not to catch defendant in the act of selling five bars of Xanax, but to obtain evidence to establish the elements of drug-induced death——that defendant sold the heroin to Frommann.

Defendant was initially arrested for distributing Xanax, as that was the only drug she agreed to sell to Uricks. However, the set up for her arrest was just the start of the investigative stratagem. Once she was arrested, the detectives withheld Frommann's death from her, and continued to engage in tactics designed to elicit more incriminating information. For instance, defendant was informed that her arrest related to the distribution of Xanax, and, following her Miranda waiver, the detectives repeatedly stated they were working on a "narcotics investigation." As Uricks acknowledged, these words were intentionally chosen, just as any mention of Frommann's death was intentionally excluded at the start, in order to encourage defendant's cooperation. It was only after defendant admitted she sold Frommann heroin and refused to name her dealer that Uricks informed her that Frommann was dead, and that they were, in fact, investigating a "drug-related death."

The detectives' investigative stratagem directly relates to the validity of defendant's waiver in considering the totality of the circumstances. As

30

articulated by the <u>Diaz</u> court, "[a]ffirmatively misleading an interrogee about the seriousness of the offense for which he or she was taken into custody strikes at the heart of the waiver decision." <u>Id.</u> at 525. Moreover, while the holding in <u>A.G.D.</u> is limited to specific situations, its principles are relevant when considering the context of totality of the circumstances. <u>Nyhammer</u>, 197 N.J. at 407. The failure to provide a defendant with "critically important information. . . . deprives that person of information indispensable to a knowing and intelligent waiver of rights." <u>A.G.D.</u>, 178 N.J. at 68. Similarly, "evidence that the accused was threatened, tricked, or cajoled into a waiver of his privilege will render the waiver involuntary." <u>Nyhammer</u>, 197 N.J. at 407 (citing <u>Miranda</u>, 384 U.S. at 476).

As noted by the trial court, "[c]learly, a person questioned about five Xanax bars has a different understanding of the consequences of her waiver than someone questioned about strict liability homicide who faces ten (10) years in state prison if convicted." Not only was defendant's willingness to speak to detectives influenced by the type of charge presented to her, but Uricks admitted that was the detectives' intended effect. As the detectives' statements reveal, they sought to encourage defendant to speak by withholding the specter of the

drug-induced death charge, knowing it likely would have a chilling effect on her speech.

For instance, just before revealing the true nature of their investigation, Bucci warned defendant that while she may have viewed her arrest as a "regular dealing kinda case" that she did not consider "important . . . shit's about to get real." Bucci's own words suggest that while distributing five bars of Xanax may not be "that important," defendant would certainly view the strict liability charge differently. Similarly, he later warned her that the strict liability charge was not "like you got caught selling some zany bars," and stressed to her the "significance" of the strict liability charge. These statements reflected the detectives' awareness of the different implications these charges carried and revealed the detectives' strategy to question her on the lesser charge, which they anticipated she would not consider to be "that important."

Furthermore, although defendant continued speaking with the detectives after being informed of Frommann's death, Uricks testified that her demeanor changed once this information was revealed to her. Although he described her as "relaxed" throughout "most" of the interview, Uricks stated "[s]he became upset later on," when he disclosed Frommann's death and the looming drug-induced charge.

A-1281-21

Uricks's testimony establishes intentional acts by the detectives to set up a false drug deal, arrest defendant for attempting to sell five Xanax bars, and then question her about her dealings with Frommann, while pursuing the drug-induced death investigation against her. Although the detectives may have hoped defendant would reveal the "kingpin," (an argument they do not assert) their statements and subsequent actions reflect that defendant was their target. The detectives' behavior is identical to the type of trickery cautioned against in Diaz, as it is behavior "designed to induce a person to yield his or her right to remain silent and consult with an attorney before answering substantive questions." Id. at 525. As the trial court noted here, had defendant known she was being investigated for a drug-induced death, she may have had a "different understanding of the consequences of her waiver," and might have decided not to waive her rights and speak with police.

The State contends that defendant had no right to be notified of her status as a suspect for drug-induced death, as the charge was premature and could not be filed until after it received the autopsy and toxicology reports. The State relies on the Court's statement in Sims that "even when there is probable cause for an arrest," there may otherwise be insufficient information which would limit

33

an officer's ability to accurately identify the charges. 250 N.J. at 215 (citing Sims, 466 N.J. Super. at 281-83 (Susswein, J., concurring and dissenting)).

However, the Sims Court did not prohibit the consideration of probable cause for arrest in the context of assessing the totality of the circumstances, where the police intentionally misled a defendant regarding the basis for their arrest. To the contrary, the Court noted that where law enforcement engages in "bad-faith conduct," such as delaying "seeking a complaint-warrant or arrest warrant in order to avoid disclosing to an arrestee the charges that he faces," such conduct should be considered "as part of the totality-of-the-circumstances test." Id. at 216. The trial court's finding of trickery here supports concerns regarding the detectives' conduct. And it was correct to consider whether, considering the totality of the circumstances, law enforcement's bad-faith conduct impacted defendant's ability to make a knowing waiver. See Diaz, 470 N.J. Super. at 527-28.

We agree with our colleagues' conclusion in Diaz that, "at the time [the] defendant was taken into custody, the detectives were aware of facts that, viewed collectively, would lead an objectively reasonable police officer to believe that [the] defendant was criminally responsible for the victim's death." Id. at 528.

Here, the trial court reviewed the evidence available prior to defendant's arrest and concluded that, at the time of defendant's waiver, "probable cause existed to arrest her for strict liability homicide." The evidence against defendant included the following: (1) Frommann had a known history of drug abuse; (2) no foul play was suspected; (3) his body was found next to packets of heroin labeled Hype; (4) his phone had text messages to defendant regarding the purchase and sale of heroin, including an exchange on the night of his death; (5) Uricks, while impersonating Frommann, messaged defendant to buy the same drug; and (6) although defendant stated she did not have the heroin, she offered to give him Xanax to help with "withdrawal." Based on this information, even without the lab test results, Uricks acknowledged they were operating as if they were investigating a drug-induced death. Therefore, even without the confirmatory test results, the detectives had sufficient information to consider defendant a suspect in a drug-induced death, and in fact did consider defendant as the suspect in Frommann's death. They also likely had probable cause to arrest her on that charge.

Despite considering defendant a suspect in the drug-induced death, the detectives only advised defendant of charges of a lesser crime, while actively investigating her for the much more serious offense, with significantly enhanced

35                                                                    A-1281-21

repercussions. We are satisfied there is sufficient evidence to support the trial court's conclusion that the detectives' intentional decision to arrest and charge defendant with the lesser offense, despite potentially having probable cause to charge her with strict liability drug-induced death, was part of the detectives' overall investigative stratagem to withhold information from defendant and mislead her in order to obtain incriminating information against her.

The evidence further supports the trial court's conclusion that defendant's arrest for Xanax was a pretext to enable the detectives to interview her without divulging the true nature of their investigation and obtain incriminating information relevant to the strict liability drug-induced death investigation. Under the totality of the circumstances, defendant did not voluntarily and knowingly waive her Miranda rights. Therefore, we affirm the trial court's order granting defendant's motion to suppress her statements.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1281-21